31 F.3d 1478
 1994-2 Trade Cases P 70,679
 John Phillip SMITH, Plaintiff-Appellant,
v.
William B. RICKS, et al., Defendants-Appellees.
John Phillip SMITH, Plaintiff, Jerome Berg, Esq., Appellant,
v.
William B. RICKS, et al., Defendants-Appellees.
John Phillip SMITH, Plaintiff-Appellant,
v.
William B. RICKS, et al., Defendants-Appellees.
John Phillip SMITH, Plaintiff-Appellant,
v.
William B. RICKS, et al., Defendants-Appellees.
 Nos. 92-16461, 93-15586, 93-16410 and 93-17300.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted April 12, 1994.
Decided Aug. 11, 1994.
 
 Jerome Berg, San Francisco, CA, for the plaintiff-appellant.
 Jerome Berg, in pro per.
 Paul D. Fogel, Crosby, Heafey, Roach & May, Oakland, CA, for defendants-appellees.
 Marilyn Preston, Ann Arbor, MI, for amicus curiae.
 Appeals from the United States District Court for the Northern District of California.
 Before: FLETCHER, FERGUSON, and TROTT, Circuit Judges.
 TROTT, Circuit Judge:
 
 
 1
 Dr. John Smith, a cardiologist, was removed from the staff of Good Samaritan Hospital. After a lengthy peer review process, the reviewing doctors and the hospital concluded that Dr. Smith's performance was below acceptable standards of care and that removal from the hospital staff was necessary to ensure patient safety. Dr. Smith responded by filing a complaint in federal court alleging that the doctors and the hospital had engaged in an antitrust conspiracy against him and violated his due process rights.
 
 
 2
 The district court granted summary judgment and awarded attorneys' fees and costs in favor of defendants ("Good Samaritan"). The district court held that Good Samaritan was immune from federal antitrust liability pursuant to the Health Care Quality Improvement Act of 1986 ("HCQIA"), 42 U.S.C. Sec. 11101-52, which shields peer review participants from liability if certain review standards are met. The district court also held that Good Samaritan was entitled to reasonable attorneys' fees and cost pursuant to 42 U.S.C. Sec. 11113. Furthermore, the district court imposed $2,000 in Rule 11 sanctions against Dr. Smith's attorney, Jerome Berg. We have jurisdiction pursuant to 28 U.S.C. Sec. 1291, and we affirm.
 
 
 3
 * Dr. John Smith joined the medical staff of Good Samaritan Hospital in 1982. In early 1983, a dispute arose over Dr. Smith's prescription of terbutaline to an elderly patient. Dr. Smith allegedly prescribed an improper dosage of the drug. The patient went into cardiac arrest, and although initially resuscitated, subsequently died. The drug order was later altered to reflect a proper dosage, but Dr. Smith denied altering the order. After reviewing the case, the Quality Review Committee ("QRC") of Good Samaritan's Division of Cardiology recommended that the hospital assign preceptors to monitor Dr. Smith for six months. Under a preceptorship, physicians concurrently review another physician's professional performance.[1]
 
 
 4
 In 1985, the Division of Cardiology's QRC again recommended another preceptorship based on Dr. Smith's improper use of streptokinase, an anti-clotting drug. Dr. Smith appealed to the Medical Staff Executive Committee ("MEC"). On August 20, 1985, the MEC upheld the decision of the QRC to monitor Dr. Smith's use of streptokinase through a preceptorship. Dr. Smith did not appeal that decision.
 
 
 5
 On January 6, 1986, the California Board of Medical Quality Assurance ("BMQA") informed Good Samaritan Hospital that Dr. Smith's staff privileges at another hospital, O'Connor Hospital, had been revoked.[2] Confronted with the BMQA notice, Dr. Smith responded he had been "automatically terminated" from O'Connor because he was not able to associate himself with an "established group." Dr. Smith claimed O'Connor's criticisms of his care were "unfounded" and "only reviewed by a biased committee." In fact, the BMQA asked two independent cardiologists to examine the records of five of Dr. Smith's O'Connor patients. One consultant concluded that "Dr. Smith's treatment constituted evidence of negligence and incompetence," and the other consultant found that "review of these cases in my opinion shows a lack of overall medical judgment and care as would be expected by a specialist in cardiovascular disease."
 
 
 6
 Good Samaritan requested that Dr. Smith provide medical records of the five O'Connor patients as part of its own 1986 biennial review of staff privileges. Despite repeated requests, Dr. Smith refused to release these records until December 1987. Four members of Good Samaritan's Division of Cardiology, each from a different practice group, then conducted separate and independent reviews. They found that Dr. Smith's use of cardiac catheterization testing was below acceptable standards of care.
 
 
 7
 On April 14, 1988, Dr. Smith met with the Cardiology Executive Committee ("CEC"). The CEC raised its concerns regarding the O'Connor patients. However, because the Good Samaritan records of Smith's patients were not as bad, the CEC eventually recommended reappointment, subject to intensive, 12-month review and monitoring of Dr. Smith's cases.
 
 
 8
 Unbeknownst to the CEC, one of Dr. Smith's Good Samaritan patients died during a cardiac catheterization procedure just six days prior to their meeting with Dr. Smith. After reviewing the latest incident, the Division of Cardiology concluded Dr. Smith's actions were illogical, his decision to conduct the catheterization was unjustified, and his technical error in performing the procedure caused the patient's death. On June 21, 1988, the CEC again met with Dr. Smith to discuss the most recent case. Based on that case and his previous problems, the CEC unanimously recommended against reappointment.
 
 
 9
 Dr. Smith then met with the MEC to review and discuss the CEC's recommendations. On August 29, 1988, Chief of Staff Dr. McCullough wrote to Smith that the MEC had unanimously decided to recommend termination of his staff privileges.[3]
 
 
 10
 Dr. Smith appealed the MEC's decision. Pursuant to the Medical Staff Bylaws, Dr. Smith received a "Notice of Hearing/Notice of Charges." The charges against Dr. Smith involved: (1) the five O'Connor cardiac catheterization cases; (2) the Good Samaritan patient who died after a 1988 cardiac catheterization; (3) Dr. Smith's inadequate documentation of patient histories and physicals; (4) his use of streptokinase; and (5) his incorrect dosage of terbutaline in 1983. A Judicial Review Committee ("JRC") was convened and held nine days of hearings from April through August, 1989. Each session was transcribed by a court reporter, resulting in over 1,300 pages of transcripts. Dr. Smith was represented by Dr. Douville, a physician-spokesperson, as provided by the Bylaws. The Medical Staff was represented by two physicians. The JRC panel consisted of seven physicians--a hearing officer-chairman, five panel members, and one alternate. Attorneys for Dr. Smith, the Medical Staff, and the JRC also attended the hearings.
 
 
 11
 The JRC's counsel questioned each panel member in detail concerning possible bias against Dr. Smith (including patient referrals and financial interest in the outcome); two of the panel members ultimately recused themselves. The chairman of the JRC refused Dr. Smith's counsel's voir dire questions as irrelevant to bias or improper attempts at discovery. Dr. Smith's physician-spokesperson questioned the JRC chairman regarding potential bias.
 
 
 12
 The Medical Staff presented four witnesses. Dr. Smith's physician-spokesperson cross-examined all the witnesses. Dr. Smith introduced 22 exhibits and had access to all evidence the Medical Staff introduced against him. Dr. Smith testified on his own behalf and called one expert witness.
 
 
 13
 On October 2, 1989, the JRC found the Medical Staff presented sufficient evidence to support every charge, except for the terbutaline charge. Although the O'Connor cases evidenced Dr. Smith's lack of logic and medical judgment, the JRC gave them less weight because they occurred in 1982-83 and Dr. Smith had subsequently been monitored on numerous cases at Good Samaritan. Thus, the JRC recommended a rigorous, two-year preceptorship instead of termination. Believing the sanction was too lenient, the Medical Staff appealed to the Good Samaritan Board of Trustees.
 
 
 14
 The Board conducted two hearings in December 1989 and January 1990. Dr. Smith submitted a written statement. Dr. Smith's counsel conducted extensive voir dire of the Board members and at least two members recused themselves. Smith's counsel objected to several other Board members, but the Board concluded those members were not biased or prejudiced. On January 20, 1990, the Board reversed the decision of the JRC. The Board found that the preceptorship was a "woefully uncertain protection for patients." According to the Board, a preceptor could not "anticipate or react quickly enough to further lapses in Dr. Smith's judgment, thought processes and decision-making in conjunction with his treatment of patients undergoing inherently risky cardiac catheterizations." Therefore, "removal from staff by virtue of nonreappointment would appear to be the only measure which would protect patients from the fundamental inconsistencies which have been reflected in Dr. Smith's performance."
 
 
 15
 Dr. Smith then filed a complaint in federal court alleging that the termination of his staff privileges was the result of violations of the Sherman Antitrust Act, 15 U.S.C. Sec. 1 and 2, and the Clayton Antitrust Act, 15 U.S.C. Sec. 15. The complaint alleged a conspiracy theory encompassing most of the individuals who participated in the peer review proceedings. According to the complaint, the "conspirators" used the peer-review process to monopolize the market for internal medical services. Acts in furtherance of this conspiracy allegedly included conducting a peer-review process that "violated basic due process provisions" and purchasing Mission Oaks Hospital.[4]
 
 
 16
 On July 14, 1992, the district court granted summary judgment for Good Samaritan based on the immunity granted to hospital peer review participants by the HCQIA. See Smith v. Ricks, 798 F.Supp. 605 (N.D.Cal.1992). The court found Dr. Smith could not rebut the presumption of immunity afforded by the HCQIA. Id. at 611-12. Dr. Smith's subsequent motion to "correct" or reconsider the decision was denied.
 
 
 17
 On October 6, 1992, the district court granted Good Samaritan's motion for reasonable attorneys' fees and costs based on 42 U.S.C. Sec. 11113, but denied Good Samaritan's motion for sanctions. The court found that Dr. Smith's claims were "at best without foundation, and at worst, frivolous." Dr. Smith then filed a motion to "correct" the district court's order awarding attorneys' fees and costs. The district court denied the motion. Two days later, Jerome Berg, Dr. Smith's counsel, "renoticed" the same motion.
 
 
 18
 On December 4, 1992, the district court heard the "renoticed" motion. The court indicated that it intended to deny the motion and sanction Berg $2,500 for unreasonable and vexatious conduct in litigation. Observing that Berg had shown "more than a tolerable amount of disregard" for normal court procedures, the court stated it could not "continue to ignore" Berg's conduct.
 
 
 19
 Berg filed a motion for reconsideration of the sanctions. He explained that he had intended to file a notice of appeal, but through a "stupid mistake," his confusing instructions caused his secretary to prepare a renoticed motion. Berg said he signed the renoticed motion "in error without realizing that it was not the notice of appeal I had intended." Berg also claimed he was unable to pay the sanction.
 
 
 20
 On January 8, 1993, the court ordered Berg to show cause by January 29, 1993, why its tentative ruling of December 4, 1992, should not be made permanent. On February 17, 1993, the court filed a written order denying Berg's renoticed motion and imposing $2,000 in sanctions (instead of $2,500). The court relied on Berg's "pattern of misconduct" including making unreasonable discovery requests, filing unauthorized pleadings, filing an improper motion to reconsider/correct summary judgment, and filing the renoticed motion without reading it.
 
 
 21
 On April 27, 1993, the magistrate judge filed a report and recommendation regarding reasonable attorneys' fees. After a "painstaking review" of counsel's affidavits and unredacted attorneys' time sheets, the magistrate judge recommended awarding $281,344.78 in fees (six percent less than Good Samaritan requested). On August 4, 1993, the magistrate judge recommended awarding $21,777 in costs (six percent less than originally requested). The district court adopted both recommendations in full.
 
 II
 
 22
 Congress passed the HCQIA because it found the threat of liability under federal law "unreasonably discourages physicians from participating in effective professional peer review" and "[t]here is an overriding national need to provide incentive and protection for physicians engaging" in peer review. 42 U.S.C. Sec. 11101(4)-(5). Good Samaritan is immune from antitrust damages under HCQIA if it demonstrates: (1) its professional review actions complied with the fairness standards set out in 42 U.S.C. Sec. 11112(a); (2) it reported the results of the professional review action to state authorities in compliance with Secs. 11131-34; and (3) the professional review actions commenced on or after November 14, 1986, the effective date of the HCQIA. See Austin v. McNamara, 979 F.2d 728, 733 (9th Cir.1992).[5] Dr. Smith does not challenge Good Samaritan's compliance with the reporting requirement, nor does he challenge the applicability of the HCQIA. Therefore, the only issue is whether Good Samaritan was entitled to immunity based on Sec. 11112.
 
 
 23
 Section Sec. 11112(a) provides that a professional review action must be taken:
 
 
 24
 (1) in the reasonable belief that the action was in furtherance of quality health care,
 
 
 25
 (2) after a reasonable effort to obtain the facts of the matter,
 
 
 26
 (3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and
 
 
 27
 (4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).
 
 
 28
 A professional review action shall be presumed to have met the preceding standards necessary for the protection set out in section 11111(a) of this title unless the presumption is rebutted by a preponderance of the evidence.
 
 
 29
 Because the "reasonableness" requirements of Sec. 11112(a) were intended to create an objective standard, rather than a subjective standard, this inquiry may be resolved on summary judgment. See Austin, 979 F.2d at 734. The rebuttable presumption "creates a somewhat unusual standard" of review for summary judgment because the "inquiry focuses on whether [plaintiff] has provided sufficient evidence to permit a jury to find that he has overcome, by a preponderance of the evidence, the presumption that physicians in the defendants' position would reasonably have believed that their action was warranted by the facts." Id. The district court held that Dr. Smith could not rebut that presumption, and we affirm.
 
 
 30
 A. As the district court noted, Good Samaritan did not begin its review process until the BMQA notified Good Samaritan that Dr. Smith's staff privileges had been revoked at another hospital due to inadequate care. At all stages of the investigation, the peer review participants found that Dr. Smith's treatment was inadequate. Dr. Smith alleges a vague conspiracy by an "in-group" of doctors out to get him, but he never challenges the substance of their findings. As the district court concluded, Dr. Smith offers no evidence to rebut the presumption that the reviewers "would reasonably have concluded that their actions would restrict incompetent behavior or would protect patients." Austin, 979 F.2d at 734 (internal quotations omitted).
 
 
 31
 B. Good Samaritan conducted a thorough review over the course of almost two years. Good Samaritan reviewed the O'Connor records as well as the Good Samaritan records. Dr. Smith's only challenge to Good Samaritan's investigation is that he was not permitted to discover or introduce evidence regarding the conduct of other doctors. Dr. Smith essentially claims he was not the worst doctor at Good Samaritan. However, nothing in the statute, legislative history, or case law suggests the competency of other doctors is relevant in evaluating whether Good Samaritan conducted a reasonable investigation into Dr. Smith's conduct. Thus, Dr. Smith cannot rebut the presumption that the termination of his staff privileges was made after a reasonable effort to obtain the facts.
 
 
 32
 C. Dr. Smith's primary challenge to the district court's grant of summary judgment is that the hearings Good Samaritan conducted were inadequate.[6] Dr. Smith claims Good Samaritan is not entitled to immunity unless all the procedural requirements of Sec. 11112(b)(3)(C) are met. However, as discussed previously, Sec. 11112(b) describes a "safe harbor" provision. The statute expressly provides that hospitals need not meet all of the Sec. 11112(b) requirements. The ultimate inquiry is whether the notice and hearing procedures were adequate. See Fobbs v. Holy Cross Health Sys. Corp., 789 F.Supp. 1054, 1068 (E.D.Cal.1992), aff'd. 29 F.3d 1439, 1445 (9th Cir.1994). Nevertheless, Good Samaritan's hearing procedures satisfied the "safe harbor" provisions of Sec. 11112(b)(3).[7]
 
 
 33
 During the hearing, the physician must have the right:
 
 
 34
 (i) to representation by an attorney or other person of the physician's choice,
 
 
 35
 (ii) to have a record made of the proceedings, copies of which may be obtained by the physician upon payment of any reasonable charges ...,
 
 
 36
 (iii) to call, examine, and cross-examine witnesses,
 
 
 37
 (iv) to present evidence determined to be relevant by the hearing officer, regardless of its admissibility in a court of law, and
 
 
 38
 (v) to submit a written statement at the close of the hearing.
 
 
 39
 42 U.S.C. Sec. 11112(b)(3)(C).
 
 
 40
 The district court found that Good Samaritan's proceedings satisfied those requirements. We agree. Dr. Smith raises a number of "procedural defects," but we reject his claims. First, Dr. Smith asserts he was denied the right of representation because his attorney could not cross-examine witnesses at the hearings. Dr. Smith's attorney, however, was present at the hearings, and Dr. Smith's physician-spokesperson did cross-examine the witnesses. Second, Dr. Smith complains about limits placed on voir dire of the JRC. But Sec. 11112(b)(3) does not require voir dire. It only requires that members of the panel hearing the case not be in direct economic competition with the affected physician. Third, Dr. Smith claims that no retired judge presided over the proceedings and "jury instructions" were not given. Once again, nothing in the statute requires such formalities.
 
 
 41
 Dr. Smith raises numerous other alleged defects. Essentially, he wants peer review proceedings to look like regular trials in a court of law. Whether or not that is a good suggestion, Sec. 11112(b) does not pose such a requirement. Rather, Sec. 11112(b) lists certain procedures, which, if satisfied, guarantee a shield from liability. Good Samaritan's procedures either fit into the Sec. 11112(b)(3) "safe harbor," or are so close to the "safe harbor" that no reasonable jury could find Dr. Smith rebutted the presumption that the procedures were adequate.[8]
 
 
 42
 D. Based on the foregoing, we hold that the district court did not err in granting summary judgment in favor of Good Samaritan. Dr. Smith failed to rebut the presumption that, after a reasonable effort to obtain the facts and an adequate hearing, Good Samaritan reasonably believed its action was warranted.
 
 III
 
 43
 If a defendant "substantially prevails" and satisfies the immunity requirements of Sec. 11112(a), the HCQIA provides:
 
 
 44
 [T]he court shall, at the conclusion of the action, award to a substantially prevailing party defending against any such claim the cost of the suit attributable to such claim, including reasonable attorney's fee, if the claim, or the claimant's conduct during the litigation of the claim, was frivolous, unreasonable, without foundation, or in bad faith.
 
 
 45
 42 U.S.C. Sec. 11113. The policy behind this provision is clear: Congress wanted to encourage professional peer review by limiting the threat of unreasonable litigation expenses. See id. Sec. 11101.
 
 
 46
 The district court held that Good Samaritan was entitled to attorneys' fees and costs. The court noted Good Samaritan satisfied the immunity provisions of Sec. 11112(a) and had substantially prevailed. The court then found that Dr. Smith's "antitrust claims were at best without foundation, and at worst frivolous" and that Good Samaritan suffered great expense in defending themselves against "what was an aggressively, and, at times, inappropriately prosecuted case." The district court further observed that Dr. Smith produced no evidence suggesting a conspiracy or concerted effort to restrain trade. In other words, the district court believed Dr. Smith had no basis for alleging an antitrust violation and produced no evidence supporting his claim.
 
 
 47
 We review the district court's decision to award attorneys' fees and costs under the HCQIA for abuse of discretion. Johnson v. Nyack Hosp., 964 F.2d 116, 123 (2d Cir.1992), and we affirm. The district court did not abuse its discretion in characterizing Dr. Smith's claim as without foundation or frivolous. Dr. Smith never produced any evidence suggesting an antitrust violation. At best, Dr. Smith pointed out some procedural defects in the hearing process. Dr. Smith argues the district court improperly awarded fees because of the lack of "direct evidence" of the antitrust violations. Dr. Smith correctly points out that "direct evidence" is not always needed to establish an antitrust violation. The district court, however, was not using the term "direct evidence" for its technical evidentiary meaning. Rather, the district court used it to explain that Dr. Smith offered nothing but unsupported allegations.
 
 
 48
 Dr. Smith argues his claim was not frivolous because of the absence of case law interpreting what procedures were due under the HCQIA. While few courts have addressed the issue, the statute does describe the "safe harbor" procedures in some detail. Because Good Samaritan met those requirements, it is difficult to argue the statute was ambiguous. Moreover, even if it was a close issue whether Good Samaritan was entitled to immunity under the HCQIA, Dr. Smith still had to prove an antitrust violation. As the district court noted, he simply could not.
 
 
 49
 Dr. Smith also challenges the amount of the attorneys' fees and cost awards as excessive. However, the magistrate judge carefully reviewed the affidavits and billing entries. The final award of $281,344.78 in fees and $21,777 in costs was six percent less than Good Samaritan requested, and apparently significantly less than the expenses Good Samaritan actually incurred. Nothing suggests the amount of the award was an abuse of discretion.
 
 IV
 
 50
 The district court imposed $2,000 in Rule 11 sanctions against Smith's counsel, Jerome Berg. The district court based its sanctions on Berg's "pattern of misconduct" during the course of the litigation culminating in his filing of a renoticed motion to "correct" the district court's order awarding attorneys' fees. We review orders imposing Rule 11 sanctions for abuse of discretion, see United States ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc., 971 F.2d 244, 248 (9th Cir.1992), and we affirm.
 
 
 51
 Rule 11 imposes a duty on attorneys to certify by their signature that (1) they have read the pleadings or motions they file and (2) the pleading or motion is "well-grounded in fact," has a colorable basis in law, and is not filed for an improper purpose. Fed.R.Civ.P. 11; Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 393, 110 S.Ct. 2447, 2454, 110 L.Ed.2d 359 (1990). "An attorney who signs the paper without such a substantiated belief shall be penalized by an appropriate sanction ... [which] may, but need not, include payment of the other parties' expenses." Cooter, 496 U.S. at 393, 110 S.Ct. at 2454 (internal quotations omitted). According to the Supreme Court, "the central purpose of Rule 11 is to deter baseless filings in district court." Id.
 
 
 52
 To affirm the $2,000 sanction, we need only look to the improperly renoticed motion. Berg claims he meant to file a notice of appeal, but instead renoticed a motion that already had been denied. Berg, thus, admits he did not read the renoticed motion and that it was baseless. Berg pleads it was just a "stupid mistake." But as the district court pointed out, "[C]ounsel can no longer avoid the sting of Rule 11 sanctions by operating under the guise of a pure heart and empty head." (quoting Zuniga v. United Can Co., 812 F.2d 443, 452 (9th Cir.1987)).
 
 
 53
 As for the amount, Berg claims Good Samaritan incurred no cost in showing up for the December 4 hearing. On its face, the claim is absurd. While the district court did not calculate the exact amount incurred in defending this particular motion, $2,000 is not an unreasonable amount. In light of the entire "pattern of misconduct" and the court's previous restraint in imposing sanctions, it was not an abuse of discretion to award $2,000.
 
 
 54
 Berg also claims the sanctions were awarded in violation of some vague due process rights. The court gave Berg a full opportunity to explain why sanctions should not be awarded. Although the district court had previously denied Good Samaritan's request for sanctions, it was free to change its mind after Berg continued to engage in his misconduct. There is no "single jeopardy" requirement regarding sanctions.
 
 V
 
 55
 Good Samaritan requests attorneys' fees and costs on appeal pursuant to 42 U.S.C. Sec. 11113. We have awarded appellate fees to the prevailing party under similar statutes. See, e.g., Gomez v. City of Watsonville, 863 F.2d 1407, 1419 (9th Cir.1988) (awarding appellate fees under 42 U.S.C. Sec. 1988), cert. denied, 489 U.S. 1080, 109 S.Ct. 1534, 103 L.Ed.2d 839 (1989). Awarding appellate fees and costs would further the HCQIA's goal of protecting physicians who engage in professional peer review. See 42 U.S.C. Sec. 11101(5). We find that Dr. Smith's appeals were frivolous, unreasonable, and without foundation. The law clearly entitled Good Samaritan to immunity, and Dr. Smith could point to no evidence of an antitrust conspiracy. Consequently, Dr. Smith would normally be liable for Good Samaritan's attorneys' fees and costs on appeal pursuant to Sec. 11113.
 
 
 56
 But if anyone is truly at fault in pursuing this meritless claim, it is Dr. Smith's counsel, Jerome Berg. He should have known his legal arguments were clearly frivolous. Instead of recognizing his misconduct when the district court imposed sanctions, Mr. Berg pressed on. Mr. Berg argued this court should apply various state law decisions and professional guidelines in place of the text of the HCQIA. His appeal of the Rule 11 sanctions is so frivolous that one need only recite his claims to recognize their absurdity. Mr. Berg has wasted this court's time with his baseless appeal and forced Good Samaritan to incur great expense.
 
 
 57
 Although Sec. 11113 is silent as to who shall pay fees, it is unclear whether we can assess fees against a party's attorney pursuant to the statute. See Roadway Express, Inc. v. Piper, 447 U.S. 752, 761 & n. 9, 100 S.Ct. 2455, 2461 & n. 9, 65 L.Ed.2d 488 (1980) (42 U.S.C. Sec. 1988 does not permit recovery from opposing counsel); Quiroga v. Hasbro, Inc., 934 F.2d 497, 504 (3d Cir.1991) (Title VII does not permit recovery from opposing counsel). We do, however, have discretion to award damages, including attorneys' fees, and single or double costs as sanction against bringing a frivolous appeal. Fed.R.App.P. 38; McConnell v. Critchlow, 661 F.2d 116, 118 (9th Cir.1981). An appeal is frivolous if the result is obvious or the arguments of error are wholly without merit. See McConnell, 661 F.2d at 118. Because we conclude the appeal was wholly without merit, we choose to exercise our discretion and grant Good Samaritan single costs and attorneys' fees for this appeal pursuant to Fed.R.App.P. 38. Mr. Berg, not Dr. Smith, is ordered to pay this award because Mr. Berg is directly responsible for making frivolous legal arguments, both in his own appeal and Dr. Smith's appeals. See In re Becraft, 885 F.2d 547, 548 (9th Cir.1989) (recognizing authority to impose Rule 38 sanctions directly on counsel); see also Hill v. Norfolk & W. Ry., 814 F.2d 1192, 1201 (7th Cir.1987).
 
 
 58
 Attorneys for Good Samaritan shall file affidavits and documentation regarding fees earned in this appeal with the clerk of the court within 14 days from the date of entry of this opinion. The amount of the award shall be established by a supplemental order.
 
 
 59
 AFFIRMED WITH SANCTIONS.
 
 
 
 [1]
 The Good Samaritan Hospital Medical Staff Bylaws ("Bylaws") provide that every physician who provides medical services at Good Samaritan must be a member of the Medical Staff. Appointment and reappointment to the Medical Staff is granted only in accordance with the Bylaws. Initial appointments to the Medical Staff are made for a period of two years, and reappointment for terms of two years is made by the Board of Trustees in accordance with the Bylaws
 The Medical Staff at Good Samaritan Hospital is organized into twelve departments, including the Department of Medicine, Department of Surgery, Department of Pediatrics, etc. The Department of Medicine is organized into four divisions, one of which is the Division of Cardiology. Dr. Smith worked in the Department of Medicine, Division of Cardiology.
 The Bylaws provided that each department must have a Department Executive Committee, which is comprised of the Department Chairman, Vice Chairman, Secretary ("officers") and one physician appointed by the Department of Family Practice. Each of the officers of a Department Executive Committee is a member of the active medical staff of that department. Every department or division may also form a Quality Review Committee ("QRC") to review data and medical records. Members of the QRC are either elected by the department/division or appointed by the Chairman of the department/division. The QRC reports to that Department's Executive Committee.
 The Bylaws outline the procedure for reappointment. First, the Department Executive Committee reviews its members and makes a recommendation on reappointment to the Credentials Committee. The Credentials Committee is comprised of a designee from each department and two elected staff members at large. The Credentials Committee evaluates recommendations from the departments and advises the Medical Staff Executive Committee regarding reappointment.
 The Medical Staff Executive Committee is comprised of the Chief of Staff, the immediate past Chief of Staff, the Chief of Staff-Elect, the Secretary-Treasurer, the Chairman of each department and division having fifteen or more active members, and two elected members of the Medical Staff. It also has several nonvoting members. The Medical Staff Executive Committee reviews the recommendations of the Department Executive Committee and the Credential Committee and then makes a recommendation to the Board of Trustees.
 If the Medical Staff Executive Committee recommends against reappointment, the physician may appeal to the Judicial Review Committee ("JRC"). The Bylaws do not describe how members of the JRC are selected, but the record reflects that the JRC in this case was comprised of seven physicians from different departments.
 The Bylaws provide guidance regarding the hearing process before the JRC. The Medical Staff is represented at the hearing by a Medical Staff member who is knowledgable about the matter; he or she is selected by the Chief of Staff. Both the Medical Staff and the person requesting the hearing are entitled to have legal counsel, as is the JRC itself. The Chairman of the JRC serves as the hearing officer. The JRC's recommendation is referred to the Board of Trustees.
 The Board of Trustees acts as the final appeals committee. Its decision is final.
 
 
 [2]
 Pursuant to California Business & Professions Code Secs. 805 & 805.1, whenever a physician's staff privileges are terminated, the professional staff responsible for that termination must file a report with the Medical Board of California (formerly the Board of Medical Quality Assurance)
 
 
 [3]
 The MEC offered to consider Smith's reapplication if he would agree to psychiatric treatment and strict monitoring. Because Dr. Smith and the MEC were unable to agree on acceptable conditions for reapplication, the MEC reaffirmed its recommendation that Smith's privileges be terminated
 
 
 [4]
 Dr. Smith had also maintained staff privileges at Mission Oaks Hospital. In 1989, Health Dimensions, Inc., the operator of Good Samaritan, acquired Mission Oaks Hospital and merged the two institutions. The medical staff of Mission Oaks was dissolved. Staff members of Mission Oaks who did not have privileges at Good Samaritan Hospital were invited to apply. Dr. Smith did not apply
 
 
 [5]
 The Austin court lists a fourth requirement that defendants "satisf[y] Sec. 11112(b)'s requirement of adequate notice and hearing." 979 F.2d at 733. Section 11112(b) lists a series of characteristics and requirements for conducting hearings and giving notice regarding professional review actions. However, Sec. 11112(b) specifically provides: "A professional review body's failure to meet the conditions described in this subsection shall not, in itself, constitute failure to meet the standards of [adequate notice and hearing procedures as provided in] subsection (a)(3) of this section." In other words, Sec. 11112(b) describes a "safe harbor" for immunity, but it is not necessary to satisfy Sec. 11112(b) to receive immunity. See also H.R.Rep. No. 99-903, 99th Cong., 2d Sess. 10-11 (1986), reprinted in 1986 U.S.C.C.A.N. 6384, 6393. Because the plaintiff in Austin did not challenge defendants' compliance with the notice and hearing requirements, we reject as dicta any suggestion in Austin that a hospital satisfy Sec. 11112(b) in order to receive immunity
 
 
 [6]
 Dr. Smith does not challenge the notice of proposed action and notice of hearing that he received from Good Samaritan. Both notices appear to comply with the requirements of Sec. 11112(b)(1) and (2)
 
 
 [7]
 Only the hearing procedures of Sec. 11112(b)(3)(C) are at issue. Dr. Smith conceded below that the JRC hearing was held before a panel of physicians who were not in economic competition with him. Thus, the requirement of Sec. 11112(b)(3)(A) was satisfied. Also, there is no question that Good Samaritan gave Dr. Smith a written statement describing the basis for its decision upon completion of the hearings, satisfying Sec. 11112(b)(3)(D)
 
 
 [8]
 Dr. Smith contends that Good Samaritan cannot be immune from liability because its hearings violated state law and fair procedure guidelines of various professional organizations. Whether or not Good Samaritan violated state law or professional guidelines is irrelevant because once the immunity provisions of the HCQIA are met, defendants "shall not be liable in damages under any law of the United States or of any State" based on a professional review action. Sec. 11111(a)(1)
 Even if relevant, it is not clear Good Samaritan violated state law or professional guidelines. For example, at the time of the JRC hearing, California law did not give a physician the right to have an attorney in a peer review proceeding, and the courts had approved of the practice of having the affected physician represented by another physician. See Anton v. San Antonio Community Hosp., 19 Cal.3d 802, 140 Cal.Rptr. 442, 456-57, 567 P.2d 1162, 1176-77 (1977); Gill v. Mercy Hosp., 199 Cal.App.3d 889, 245 Cal.Rptr. 304, 311-12, cert. denied, 488 U.S. 892, 109 S.Ct. 227, 102 L.Ed.2d 217 (1988).