Robert S. MATHEWS, M.D., Plaintiff,

v.

LANCASTER GENERAL HOSPITAL, Lancaster General Hospital Foundation, Columbia Hospital, Columbia Hospital Foundation, Gerald W. Rothacker, Jr., M.D., Thomas R. Westphal, M.D., John H. Shertzer, M.D., J. Paul Lyet, M.D., James P. Argires, M.D., Hugh H. Hoke, Jr., M.D., Defendants.

Robert S. MATHEWS, M.D., Plaintiff,

v.

ORTHOPEDIC ASSOCIATES OF LANCASTER, Defendant.

Civ. A. Nos. 93–6774, 94–4647.

United States District Court, E.D. Pennsylvania.

May 4, 1995.

Judah I. Labovitz, Richard M. Squire, Roberta A. Golden, Lawrence J. Schempp, Philadelphia, PA, for plaintiff.

Reeder R. Fox, Wayne A. Mack, Thomas Ermi, Philadelphia, PA, for Lancaster defendants, Rothacker, Westphal, Shertzer, Lyet, Argires, Hoke.

Kathleen M. Chancler, Philadelphia, PA, for Columbia defendants.

John G. Harkins, Jr., Eleanor Morris Illoway, Philadelphia, PA, for defendant Orthopedic Associates of Lancaster.

## OPINION AND ORDER

VAN ANTWERPEN, District Judge.

These consolidated actions stem from a physician peer review proceeding which eventually led to a curtailment of plaintiff's surgical privileges at the defendant hospitals. The Complaints in both cases allege a conspiracy in restraint of trade in violation of section one of the Sherman Act, 15 U.S.C. § 1, as well as various state law claims. Currently before the court are all defendants' motions for summary judgment. We have subject matter jurisdiction over the antitrust claims pursuant to 28 U.S.C. §§ 1331 and 1337, and 15 U.S.C. §§ 4, 15, and 26 and supplemental jurisdiction over the state claims pursuant to 28 U.S.C. § 1367.[1]

## I. FACTUAL BACKGROUND

No party disputes the following facts.

### A. The parties

Plaintiff Robert S. Mathews, M.D. is an orthopedic surgeon who specializes in spine trauma and spine diseases. Since 1988, Dr. Mathews has been a corporate partner with another orthopedic surgeon, George M. Kent, M.D., who also performs spine surgery. Dr. Kent is not a party to this suit.

Defendants Lancaster General Hospital ("LGH") and Lancaster General Hospital Foundation ("LGH Foundation") are non-profit corporations which operate and support, respectively, a hospital in Lancaster, Pennsylvania. Defendants Columbia Hospi-

---

1. We note that, pursuant to the Stipulated Protective Order entered by the court on June 8, 1994, the parties have filed most of their briefs and exhibits regarding this motion under seal. In accordance with the strong presumption of public access to judicial records described in *Pansy v. Borough of Stroudsburg,* 23 F.3d 772 (3d Cir.1994) and *Leucadia, Inc. v. Applied Extrusion Technologies, Inc.,* 998 F.2d 157, 161–64 (3d Cir.1993), we find that there is nothing in this opinion which would warrant denying full public access to its text.

tal ("Columbia") and Columbia Hospital Foundation, Inc. ("Columbia Foundation") are non-profit corporations which operate and support, respectively, a hospital in Columbia, Pennsylvania. · The LGH Foundation is the parent organization of LGH, and the Columbia Foundation is the parent organization of Columbia. On February 28, 1994, the LGH Foundation and the Columbia Foundation entered into a "Membership Agreement" which resulted in an affiliation between the two hospitals.

Dr. Mathews has had active staff privileges at LGH since 1973. His office at 554 North Duke Street is directly across the street from LGH. Dr. Mathews' first association with Columbia occurred in April of 1992, when he was granted temporary privileges there in the Division of Surgery, Orthopedics.

The six individual physician defendants, Drs. Rothacker, Westphal, Shertzer, Lyet, Argires, and Hoke, are four orthopedic surgeons, a neurosurgeon, and a radiologist, respectively. Drs. Shertzer and Argires are members of LGH's Board of Directors ("the LGH Board"). Dr. Hoke is an ex-officio member of the LGH Board.

Defendant Orthopedic Associates of Lancaster ("OAL") is a professional corporation located in Lancaster, Pennsylvania. OAL is an orthopedic surgery group which practices at LGH. Drs. Rothacker, Westphal, and Shertzer practice with OAL and are shareholders of the corporation.

## B. The December 1989 incident and investigation

The chain of events that eventually led to the filing of this lawsuit began on December 27, 1989. That morning, Dr. Kent was performing spinal surgery on a patient at LGH. Dr. Mathews was listed as co-surgeon for the operation. During the procedure, a high-speed drill slipped, causing damage to the patient's esophagus. Dr. Kent attempted to repair the esophagus, but did not seek assistance or a consultation regarding the damage done. According to Dr. Kent, Dr. Mathews was not present in the room at the time of the incident, at least not until after the repair of the esophagal tear had been completed. Later that day, the patient experienced se-· vere problems and had to undergo a second, emergency surgery to repair the tear.

As a result of these complications, Dr. Kent was suspended for five days, and an Ad Hoc Committee was appointed to investigate the incident. Defendant Hugh H. Hoke, Jr., M.D. was chosen to be the chairman of the committee, which consisted of several other physicians who are not parties to this action ("the Hoke Committee"). After a five-day investigation, the Hoke Committee concluded that Dr. Kent had acted inappropriately by virtue of his failure to seek a consultation once harm had been done to the patient's esophagus. In a report dated January 4, 1990, the committee recommended that "a focused review of all Dr. Kent's cases should be performed by the Quality Assurance Committee of the Department of Surgery for a period of six months."

The Hoke Committee's report was forwarded to Dr. Kent on the same day it was issued. In response, by way of a letter dated January 5, 1990, Dr. Kent made minor modifications to the report and indicated his agreement with the recommended corrective action, including the focused review of his cases.

Although recognizing that plaintiff Dr. Mathews may not have been in the operating room during the events in question, in its report the Hoke Committee concluded that as co-surgeon, he bore "some responsibility for the incident." On January 5, 1990, Mr. Michael Young, LGH's Chief Executive Officer, wrote Dr. Mathews a letter informing him of this conclusion.

## C. LGH's focused review of Dr. Kent's cases

In accordance with the Hoke Committee's recommendation, a focused review of Dr. Kent's cases was indeed performed. However, for reasons that are disputed, the review was not performed by the Quality Assurance Committee of the Department of Surgery as suggested in the report. Rather, it was performed by a second Ad Hoc Committee selected by defendant Department of Surgery Chairman Gerald W. Rothacker, Jr., M.D., and composed of himself and two other board

certified orthopedic surgeons, defendants Thomas R. Westphal, M.D. and J. Paul Lyet, M.D. ("the Rothacker Committee").

The Rothacker Committee reviewed surgical cases covering a period from January 1990 to June 1990 and involving Dr. Kent as either the primary or assisting surgeon. The committee's review encompassed 208 cases and took approximately two years, beginning sometime in March of 1990. At the end of the review, the committee concluded that 27 of the 208 cases evidenced a substandard level of care.

During the course of its focused review of Dr. Kent, the Rothacker Committee discovered that the medical records in almost every case reviewed identified plaintiff Dr. Mathews as participating in the surgery in some capacity. In particular, it was discovered that 23 of the 27 cases which were found not to meet the standard of care involved spine surgery, and that Dr. Mathews was the primary surgeon in each of those cases.

Dr. Rothacker reported the findings of the committee by way of a March 19, 1992 letter to then-President of the LGH Medical and Dental Staff Robert P. Johnson, M.D. and a report to the Executive Committee of the Medical and Dental Staff on April 6, 1992. The letter recommended that the 27 files rated substandard by the committee be sent to an outside agency for further review and stated that "[i]f this agency agrees that these cases were not managed in an acceptable fashion, a restriction of privileges would be indicated." Attached to the letter was a list of the cases at issue, with comments as to each.

Both Dr. Kent and Dr. Mathews were sent copies of Dr. Rothacker's March 19th letter. Subsequently, in a letter dated April 30, 1992, Dr. Johnson wrote to Dr. Mathews, informing him that the review of Dr. Kent's cases had included a review of his work and that the Medical and Dental Staff Executive Committee was going to have an outside consultant review the cases in question. Attached to this letter was a copy of the minutes of the April 6, 1992 meeting of the Executive Committee. The minutes also indicated that the review of Dr. Kent had involved a review of Dr. Mathews' work, and

stated that review by an outside review agency "may result in a recommendation regarding Dr. Mathews' clinical privileges."

### D. The independent review

LGH retained the American Medico–Legal Foundation to select an independent consultant to review the cases deemed substandard by the Rothacker Committee. The Foundation chose Philip D. Wilson, Jr., M.D. of Cornell Medical College.

Drs. Kent and Mathews were given an opportunity to submit to Dr. Wilson additional information regarding the medical files selected for review, and both submitted some supplementary materials. On March 18, 1993, after reviewing all the information submitted by LGH and Drs. Mathews and Kent, Dr. Wilson issued a report concluding that the quality of care rendered by Drs. Mathews and Kent was inadequate and below acceptable standards in several respects. Dr. Wilson recommended that both doctors' privileges to perform spine surgery be restricted until they were able to "demonstrate a renewed and updated understanding of present day principles and practice of this type of surgery."

By letter of May 10, 1993 from LGH CEO Mr. Young, Dr. Mathews was informed of Dr. Wilson's conclusions and furnished with a copy of his report.

### E. LGH's restriction of Dr. Mathews' privileges

On July 29, 1993, Dr. Mathews sent LGH his 1994–95 staff privileges application. For reasons that remain in dispute, in his application Dr. Mathews did not request privileges to perform spine surgery. Also, a letter accompanying the application and addressed to Dr. Hoke stated that "[v]oluntarily I plan to stop doing spinal surgery for medical reasons at Lancaster General Hospital." On November 17, 1993, the LGH Board of Directors granted plaintiff's 1994–95 privileges as requested, i.e., without spine surgery privileges.

Meanwhile however, on September 16, 1993, the LGH Board of Directors had voted to restrict the surgical privileges held by Dr.

Mathews at that time. Specifically, the Board voted to suspend Dr. Mathews' privileges to perform spine surgery as either a primary or assisting surgeon, and to require him to obtain a second opinion or consultation before performing prosthetic joint surgery, arthroscopy, or hand or foot surgery for a period of 12 months. The defendant physicians on the Board, Drs. Shertzer and Argires, abstained from voting. Defendant Dr. Hoke, an ex-officio member of the Board, also did not vote.

Dr. Mathews was notified of the Board's decision by a letter from Mr. Young dated September 22, 1993. The letter also advised Mathews of the reasons for the proposed restrictions and of his right under the LGH Medical Staff Bylaws to a fair hearing regarding the proposed action. On October 26, 1993, Mathews made a timely request for such a hearing. Subsequently, the Board voted not to impose any restrictions until the fair hearing could be held. The hearing had not yet been scheduled when the first of these two consolidated actions was filed on December 15, 1993, and to date no such hearing has taken place.

### F. Dr. Mathews' staff privileges at Columbia

Also during the period when the above events were taking place, plaintiff for the first time applied for surgical privileges at defendant Columbia. Effective April 22, 1992, Columbia granted Dr. Mathews "temporary privileges" there in the Division of Surgery, Orthopedics. These privileges were scheduled to expire on September 30, 1992. Approximately two weeks before the expiration date, Columbia's Board of Trustees approved the Medical Staff's recommendation that Dr. Mathews be granted "provisional courtesy privileges" in the Division of Surgery, Orthopedics. As set out in Columbia's Bylaws, all initial appointments to the medical staff are "provisional" for a period of twelve months. On September 15, 1992, Mr. Robert Katana, president and CEO of Columbia Hospital, wrote to Dr. Mathews, informing him of the Board of Trustees' decision.

Near the end of the twelve month "provisional" period, on August 25, 1993, Columbia's Credentials Committee recommended to Columbia's Medical Executive Committee and its Board of Trustees that Dr. Mathews' status change from "provisional courtesy privileges" to "courtesy privileges" in the Division of Surgery, Orthopedics. The Board of Trustees approved this change on September 13, 1993, and on September 16, 1993 Mr. Katana sent Dr. Mathews a letter informing him of the lifting of his provisional status.

Meanwhile, Dr. Mathews had submitted a reappointment application to have his privileges renewed for the next year beginning January 1, 1994, as was normal procedure under Columbia's Bylaws. Although Dr. Mathews submitted his reappointment application prior to the September 1, 1993 deadline, on September 24, 1993 Mr. Katana discovered that the application was not complete because it did not include a reappointment reference from LGH. Columbia requires all staff physicians to submit completed reappointment references from any other hospitals where they exercise privileges.

Despite repeated efforts, Columbia was unable to obtain LGH's completed reappointment reference from either Dr. Mathews' office or directly from LGH. Accordingly, on November 10, 1993, Mr. Katana wrote to Dr. Mathews informing him that his reappointment application was incomplete and that his courtesy staff privileges would therefore automatically expire on December 31, 1993. Mr. Katana also informed Dr. Mathews that he could reapply for those privileges in accordance with the procedures set out in Columbia's Bylaws.

Dr. Mathews never submitted the reappointment reference from LGH, and his courtesy staff privileges at Columbia expired on December 31, 1993. After that date, however, Columbia again granted Dr. Mathews "temporary privileges," which he continues to exercise.

### G. Procedural history

On December 15, 1993, plaintiff filed an action against LGH, the LGH Foundation, Columbia, the Columbia Foundation, and the

six individual doctors listed above. The Complaint was amended on September 9, 1994. Count I of the Verified Amended Complaint is an antitrust claim alleging a conspiracy in violation of section one of the Sherman Act, 15 U.S.C. § 1, and seeking treble damages and injunctive relief pursuant to sections four and sixteen of the Clayton Act, 15 U.S.C. §§ 15 & 26. Counts II through IV allege state law claims of breach of contract, intentional interference with contractual relations, and civil conspiracy. On August 1, 1994, plaintiff filed a second, two-count Complaint against OAL, alleging a violation of section one of the Sherman Act and a state law claim of intentional interference with contractual relations. This court consolidated the actions for pretrial purposes in an order dated November 18, 1994.

All defendants moved for summary judgment in late 1994. On December 1, 1994, the court denied defendants' motions for administrative purposes in order to allow plaintiff an additional discovery period of 60 days which he had requested. After the 60-day period, each defendant renewed its motion for summary judgment, and plaintiff renewed its responses to those motions and submitted a supplementary memorandum addressing materials uncovered during the additional discovery period. It is these summary judgment motions which are currently before the court.

## II. STANDARD OF REVIEW

■ Rule 56(c) of the Federal Rules of Civil Procedure provides for summary judgment where the

> pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.

"The party moving for summary judgment must demonstrate that, under the undisputed facts, the non-movant has failed to introduce evidence supporting a necessary element of his case." *In re Phillips Petroleum Sec. Litig.*, 881 F.2d 1236, 1243 (3d Cir.1989). To defeat summary judgment, the non-moving party must respond with facts of record that contradict the facts identified by the movant and may not rest on mere denials. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 321 n. 3, 106 S.Ct. 2548, 2552 n. 3, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(e)); *see also First Nat'l Bank v. Lincoln Nat'l Life Ins. Co.*, 824 F.2d 277, 282 (3d Cir.1987). The non-moving party must demonstrate the existence of evidence that would support a jury finding in its favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). "A non-movant's burden in defending against summary judgment in an antitrust case is no different than in any other case." *Big Apple BMW, Inc. v. BMW of North America, Inc.*, 974 F.2d 1358, 1363 (3d Cir.1992), *cert. denied,* — U.S. ——, 113 S.Ct. 1262, 122 L.Ed.2d 659 (1993).

## III. DISCUSSION

### A. HCQIA Immunity

■ Defendants, except for Columbia and Columbia Foundation, contend that they are entitled to immunity under the Health Care Quality Improvement Act ("the HCQIA" or "the Act"), 42 U.S.C. § 11101–11152 (West Supp.1994). The HCQIA is intended to "provide incentive and protection for physicians engaging in effective professional review" by immunizing them from money damages liability in connection with such proceedings. 42 U.S.C. §§ 11101(5), 11111. It was enacted in part as a response to Congress' finding that "[t]he threat of private money damage liability . . . . unreasonably discourages physicians from participating in effective professional peer review." 42 U.S.C. § 11101(4). The Act "essentially immunizes peer review action from liability if the action was taken 'in the reasonable belief that [it] was in furtherance of quality health care.' § 11112(a)." *Patrick v. Burget*, 486 U.S. 94, 105 n. 8, 108 S.Ct. 1658, 1665 n. 8, 100 L.Ed.2d 83 (1988).

More specifically, to qualify for immunity under the HCQIA, a "professional review action" must be taken:

> (1) in the reasonable belief that the action was in the furtherance of quality health care,

(2) after a reasonable effort to obtain the facts of the matter,

(3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and

(4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain the facts and after meeting the requirements of paragraph (3).

42 U.S.C. § 11112(a). If a "professional review action" meets all of these standards, then any party covered by the Act "shall not be liable in damages . . . with respect to the action." *Id.* at § 11111(a)(1).

### 1. *Which parties are covered by the HCQIA?*

■ We note that no party has addressed the issue of whether the defendants claiming immunity are persons or entities to whom the protections of HCQIA would extend, provided that the peer review process met the Act's standards. The Act provides protection to:

(A) the professional review body,

(B) any person acting as a member or staff to the body,

(C) any person under a contract or other formal agreement with the body, and

(D) any person who participates with or assists the body with respect to the action.

42 U.S.C. § 11111(a)(1). The term "professional review body" includes "a health care entity and the governing body or any committee of a health care entity which conducts professional review activity." *Id.* at § 11151(11). "[A] hospital that is licensed to provide health care services by the State in which it is located" is considered a "health care entity." *Id.* at 11151(4)(A)(i).

Guided by these definitions, it is clear that LGH and the individual physician defendants all fall within the protected categories listed in section 11111(a)(1). As a "health care entity," LGH is a "professional review body" covered under section 11111(a)(1)(A). The individual doctors, as either members/staff of LGH, persons under contract or formal agreement with LGH, or persons who assisted in a peer review action, are covered under sections 11111(a)(1)(B)–(D).

Defendants LGH Foundation and OAL, however, are not entities which are expressly mentioned in the Act. The term "health care entity," while expressly including hospitals such as LGH, does not appear on its face to include parent organizations such as LGH Foundation. *See* 42 U.S.C. §§ 1395x(e)(1) & (7), 11151(4) & (5). Thus, unlike LGH, LGH Foundation is not expressly included within the definition of a "professional review body" as stated in section 11111(a)(1)(A). Subsections (B) and (D) initially appear to encompass LGH Foundation and OAL—LGH Foundation has a contract or formal agreement with LGH, *see* § 11111(a)(1)(B), and OAL is alleged to have participated, through its agents, in LGH's peer review of plaintiff, *see* § 11111(a)(1)(D)—however, both subsections on their faces only mention "person[s]."

Neither LGH Foundation nor OAL is a natural "person"; rather, both are corporate entities. However, Congress has clarified that, "[i]n determining the meaning of any Act of Congress, unless the context indicates otherwise— . . . the words "person" and "whoever" include corporations, companies, associations, [and] firms . . . as well as individuals." 1 U.S.C.A. § 1. There is nothing in the context of the HCQIA which would lead us to conclude that corporations are not "persons" entitled to the broad protections of the Act. To the contrary, such a conclusion would utterly thwart the Act's stated overall purpose of encouraging physicians and others to participate in effective physician peer review. *See* 42 U.S.C. §§ 11101(4), 11101(5), 11111. If a plaintiff can circumvent the HCQIA's immunity provisions merely by naming as a defendant a parent corporation or a corporation in which a peer review participant is a shareholder, then corporate agents such as physicians or hospital boards would be deterred from meaningful participation in the peer review process. It makes little sense to provide immunity for an agent and deny it for the corporation on whose behalf the agent is acting. We think the term "person" is broader than that.

■ We need not decide this issue, however, because we find that even if OAL and LGH Foundation are not directly covered by the HCQIA, principles of corporate liability mandate that they be granted summary judgment if LGH and the individual physician defendants who allegedly acted on behalf of OAL are found to be immune under the HCQIA. "Under Pennsylvania law, a corporation is a legal fiction that can act only by creating agency relationships with its officers, directors, employees, and others." *Richardson v. John F. Kennedy Memorial Hosp.*, 838 F.Supp. 979, 985 (E.D.Pa.1993) (citing *Biller v. Ziegler*, 406 Pa.Super. 1, 593 A.2d 436, 439 (1991)). *See also Daniel Adams Assocs. v. Rimbach Publishing Co.*, 360 Pa.Super. 72, 79, 519 A.2d 997, 1000 (1987), *allocatur denied*, 517 Pa. 597, 535 A.2d 1056 and 517 Pa. 599, 535 A.2d 1057 (1987).[2] The Complaints reveal that the alleged liability of OAL is based solely on the actions of the three OAL agents who are named individually as defendants, Drs. Rothacker, Westphal and Shertzer. Similarly, the alleged liability of LGH Foundation is based solely on the actions of its subsidiary corporation, LGH. Neither OAL nor LGH Foundation is alleged to have acted in any other way except through these agents. Thus, the sole basis of recovery against OAL and LGH Foundation is that they are vicariously liable for the actions of the named defendants.

■ As defendant OAL correctly points out, a claim of vicarious liability depends upon the life of the claim from which it derives. "Termination of the claim against the agent extinguishes the derivative claim against the principal." *See Mamalis v. Atlas Van Lines, Inc.*, 364 Pa.Super. 360, 528 A.2d 198, 200 (1987), *aff'd*, 522 Pa. 214, 560 A.2d 1380 (1989). Accordingly, if the agents of LGH Foundation and OAL are entitled to immunity from damages under the HCQIA, then LGH Foundation and OAL themselves would also be entitled to summary judgment on the issue of damage liability. Thus, we conclude that each of the defendants asserting HCQIA immunity is a person or entity

entitled to summary judgment provided that all the requirements of the Act are met.

### 2. *How many "professional review actions"?*

■ As a second preliminary matter, we must decide which of the actions leading up to this suit constitutes a "professional review action." Defendants contend that only the Board's September 16, 1993 vote to restrict plaintiff's surgery privileges is a "professional review action." They argue that in order for immunity to attach, only this action must meet the four standards set out in section 11112(a). Plaintiff, while agreeing that the Board's vote is a "professional review action," argues that there are as many as four additional "professional review actions," each of which must individually meet the requirements of section 11112(a): 1) the Hoke Committee's review of the initial surgical incident involving Dr. Kent, 2) the Rothacker Committee's six-month review of Dr. Kent's cases, 3) the Rothacker Committee's March 19, 1992 letter recommending an outside review, and 4) the "action of [LGH] that resulted in the May 10, 1993 letter" informing plaintiff of the outside reviewer's conclusions. *See* Plaintiff's 2/13/95 Brief at 7–8. Defendants counter that these four additional acts are merely investigatory "professional review activity" leading up to a single "professional review action," i.e., the Board's vote.

The Third Circuit has not yet addressed the distinction between "professional review activity" and "professional review action" under the HCQIA. Defendants therefore rely upon two Ninth Circuit cases to support their characterization of the instant events as a number of "professional review activities" culminating in one "professional review action." *See Fobbs v. Holy Cross Health Sys. Corp.*, 29 F.3d 1439 (9th Cir.1994), *aff'g* 789 F.Supp. 1054 (E.D.Cal.1992), *cert. denied*, — U.S. —, 115 S.Ct. 936, 130 L.Ed.2d 881 (1995); *Austin v. McNamara*, 979 F.2d 728 (9th Cir.1992). Defendants also point out that at least one district court in our Circuit has tacitly followed the approach they suggest. *See Farr v. Healtheast, Inc.*,

---

**2.** We assume that Pennsylvania law applies to these Pennsylvania parties, in this federal question action involving Pennsylvania corporations and agents.

No. 91-6960, 1993 WL 220680 (E.D.Pa. June 9, 1993) (nearly 21 month ongoing peer review investigation culminating in revocation of privileges analyzed as if one professional review action for purposes of HCQIA immunity).

Plaintiff bases his interpretation primarily on the wording of the statutory definition of "professional review action." Section 11151 of the HCQIA provides in relevant part:

> (9) The term "professional review action" means an action or recommendation of a professional review body which is taken or made in the conduct of professional review activity, which is based on the competence or professional conduct of an individual physician ..., and which affects (or may affect) adversely the clinical privileges ... of the physician. Such term ... also includes professional review activities relating to a professional review action....

42 U.S.C. § 11151. Plaintiff argues that because each of the five acts he enumerates is an "action or recommendation of a professional review body ... which ... may affect adversely the clinical privileges ... of the physician," each must be considered an individual "professional review action." In support of this position, he cites *Manion v. Evans*, No. 3:89CV7436, 1991 WL 575715 (N.D.Ohio July 8, 1991), *appeal dismissed*, 986 F.2d 1036 (6th Cir.), *cert. denied*, — U.S. —, 114 S.Ct. 71, 126 L.Ed.2d 40 (1993), as well as a case cited by defendants, *Austin v. McNamara*, *supra*.

While plaintiff's interpretation might be plausible given the literal wording of one part of the statute, we find that it does not reflect the overall construction and purposes of the HCQIA. Plaintiff relies on the definition of "professional review action" to the exclusion of all other provisions of the Act. Perhaps most notably, plaintiff can provide no clue as to exactly what types of acts should be considered "professional review activity." Instead, he appears to subsume every act connected to the peer review process

into the category of "professional review action." This is an absurd result. When the definitions of both terms are read in the context of the statute as a whole, defendants' scheme of a series of "professional review activities" leading up to a final "professional review action" must prevail.

The Act defines "professional review activity" as follows:

> (10) The term "professional review activity" means an activity of a health care entity with respect to an individual physician—
>
> (A) to determine whether the physician may have clinical privileges with respect to, or membership in, the entity,
>
> (B) to determine the scope or conditions of such privileges or membership, or
>
> (C) to change or modify such privileges or membership.

42 U.S.C. § 11151(10). As outlined above, a "professional review action ... affects (or may affect) adversely [a physician's] clinical privileges" and occurs "in the conduct of professional review activity." § 11151(9). An "action" may be taken only after "a reasonable effort to obtain the facts of the matter," § 11112(a)(2), and "in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts." § 11112(a)(4).

Reading all of these statutory provisions together, we must agree with defendants that, as applied in the context of a privileges restriction, the term "professional review activity" refers to preliminary investigative measures taken in "a reasonable effort to obtain the facts" relevant to a possible change in a physician's privileges, while the term "professional review action" refers to the decision that results from a review of the facts obtained.[3] *See Fobbs v. Holy Cross Health Sys. Corp.*, 789 F.Supp. at 1065 ("[P]rofessional review activity means the investigative process during and/or upon which

---

**3.** We note that a "professional review action" may itself include some element of fact-finding or investigation, as for example, where a hearing is held which results in a change in a physician's privileges. *See Fobbs v. Holy Cross Health Sys. Corp.*, 789 F.Supp. at 1065 ("The professional

review action/decision is borne of the investigative process and may entail a secondary level of additional, more narrowed investigation as needed based on information discovered during the initial investigation.")

a professional review action, i.e., a decision, is made.").

This conclusion finds support in both the language and the construction of the statute. To begin with, there must be some distinction between "professional review activity" and "professional review action" or Congress would not have used two separate terms to refer to deeds done in connection with the peer review process. Our reading of the statute assigns a meaning to each term, rendering neither superfluous, and fits each type of act into a comprehensive, workable scheme. By contrast, the reading suggested by plaintiff ignores the term "professional review activity" and, as an example will show, is unworkable when viewed in conjunction with other statutory provisions.

If, as plaintiff argues, an investigative measure such as the initial Hoke Committee investigation were considered a "professional review action," then, under sections 11112(a)(2) and (4), it could not be undertaken until after there had been both a reasonable effort to obtain the facts of the matter and a determination that the investigation was warranted by the facts known after that reasonable effort. In other words, plaintiff's construction of the Act would require the Hoke Committee, or any such investigative body, to make a reasonable effort to obtain the facts before undertaking its effort to obtain the facts. This simply makes no sense—the investigation *is* the effort to obtain the facts.

As this example illustrates, "[i]t [is] impossible to apply the § 11112(a) standard to acts which are encompassed within the standard." *See Fobbs v. Holy Cross Health Sys. Corp.*, 789 F.Supp. at 1065 (concluding that this approach would be "nonsensical" and that the standard of section 11112(a) "is intended to apply to discrete decisions, not to an ongoing course of conduct"). The approach we adopt avoids this conundrum. It treats efforts to obtain the facts as "professional review activity," which is not separately subject to the strictures of section 11112(a). A decision, or "professional review action," is evaluated under section 11112(a) to determine whether the "professional review activity" preceding it amounts to a "reasonable" effort to obtain

the facts and provides "reasonable" substantive justification for the decision made.

This interpretation conforms not just to the language and construction of the Act, but to its purposes as well. Section 11112(a)(3) requires that a "professional review action" be taken only after the physician involved is afforded adequate notice and hearing procedures. Under plaintiff's interpretation, such notice and hearing would be required after each step of an ongoing investigative process. In the instant case, as many as five separate notice and hearing procedures would have been required. Given that one of the Act's stated purposes is to provide incentive for physicians and others to participate in peer review, we do not think Congress could have intended such an involved result. *See* 42 U.S.C. § 11101(5). "[I]t would be a nearly insurmountable chore for these defendants, or any defendants, to attempt to prove HCQIA immunity for each aspect of their entire course of conduct in response to a plaintiff's general allegations of misconduct. Such a duty would reduce the efficaciousness of the HCQIA and defeat Congress' stated purpose in promulgating it." *Fobbs v. Holy Cross Health Sys. Corp.*, 789 F.Supp. at 1065. Thus, the underlying purposes of the HCQIA also weigh in favor of our holding that the Act's standards apply to decisions, not the ongoing course of investigative conduct which provides the basis for those decisions.

Finally, we note that even the cases cited by plaintiff do not support the approach he suggests. Although both *Austin v. McNamara* and *Manion v. Evans* illustrate that a given course of conduct may include more than one "professional review action," neither suggests that investigative activity is encompassed by that term. In both cases, the courts concluded that an initial suspension of the plaintiff's privileges and a subsequent hearing to review that decision were two separate "professional review actions." *See Austin v. McNamara*, 731 F.Supp. 934, 939 (C.D.Cal.1990); *Manion v. Evans*, 1991 WL 575715, at *7–*8. The *Austin* court went on to analyze each "action" individually to determine whether it met the requirements of section 11112(a). Neither court, however,

held that any investigative activity constituted "professional review action."

In fact, the *Austin* court held exactly the opposite. It concluded that a "[professional review] 'action' can only be taken after professional review activity to determine the facts.... [T]he responsible body 'commences' an action when it begins to take an action—after it reviews the results of the required investigation." *Austin v. McNamara*, 979 F.2d at 737. Thus, *Austin* squarely supports defendants' position, not plaintiff's. In fact, activities nearly identical to those at issue in this case were considered by the *Austin* court to constitute "professional review activity." These included: a review of the plaintiff doctor's cases by another hospital doctor, followed by a report to a Surgical Audit Committee identifying alleged deficiencies; an external review by two neurosurgeons who "expressed reservations and recommended further monitoring"; an Ad Hoc Committee discussion of plaintiff's work which led to a recommendation that a six-month review be performed; and the subsequent six-month review itself. *See* 979 F.2d at 731–32, 737.

In sum, we find that neither the available caselaw nor the language, construction, or purposes of the Act support the approach suggested by plaintiff. Thus, we agree with the *Fobbs* court that "[t]he HCQIA does not require that a professional review body's entire course of investigative conduct meet particular standards in order for it to be immune from liability in its ultimate decision." 789 F.Supp. at 1065. Accordingly, we hold that only the LGH Board's September 16, 1993 vote to restrict Dr. Mathews' surgical privileges is a "professional review action." The other actions enumerated by plaintiff constitute "professional review activity" and as such are not subject to separate scrutiny under section 11112(a).

3. *Objective or subjective standard?*

■ As a final preliminary matter, we must decide whether the reasonableness requirements of section 11112(a) create an objective or subjective standard for reviewing a professional review action. Although the Third Circuit has yet to address this issue, every other Circuit which has considered it

has concluded that the legislative history of the Act mandates an objective standard. *See Imperial v. Suburban Hosp. Ass'n*, 37 F.3d 1026, 1030 (4th Cir.1994) ("The standard is an objective one which looks to the totality of the circumstances."); *Bryan v. James E. Holmes Regional Medical Ctr.*, 33 F.3d 1318, 1323 (11th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1363, 131 L.Ed.2d 220 (1995); *Smith v. Ricks*, 31 F.3d 1478, 1485 (9th Cir. 1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1400, 131 L.Ed.2d 287 (1995) ("[T]he 'reasonableness' requirements of § 11112(a) were intended to create an objective standard, rather than a subjective standard...."); *Austin v. McNamara*, 979 F.2d at 734. As most of these courts have noted, the House report on § 11112(a) states:

> Initially, the Committee considered a 'good faith' standard for professional review actions. In response to concerns that 'good faith' might be misinterpreted as requiring only a test of the subjective state of mind of the physicians conducting the professional review action, the Committee changed to a more objective 'reasonable belief' standard. The Committee intends that this test will be satisfied if the reviewers, with the information available to them at the time of the professional review action, would reasonably have concluded that their actions would restrict incompetent behavior or would protect patients.

H.R.Rep. No. 903 99th Cong., 2d Sess. 10 *reprinted in* 1986 U.S.C.C.A.N. 6287, 6384, 6392–93. Given this clear statement of Congressional intent and the weight of authority from other Circuits, we too conclude that the reasonableness requirements of § 11112(a) are intended to create an objective standard, rather than a subjective or good faith standard. Thus, the issue we must address is, whether "physicians in the defendants' position would reasonably have believed that their action was warranted by the facts." *Smith v. Ricks*, 31 F.3d at 1485.

4. *Were the requirements of § 11112(a) met?*

■ We now turn to the question of whether the Board's vote to restrict plaintiff's privileges satisfies the substantive and

procedural requirements set out in section 11112(a). A professional review action is presumed to meet the requirements "unless the presumption is rebutted by a preponderance of the evidence." 42 U.S.C. § 11112(a). On summary judgment, this presumption yields a "somewhat unusual" standard of review. *See Austin v. McNamara*, 979 F.2d at 734. The court must ask: Might a reasonable jury, viewing the facts in the light most favorable to the plaintiff, conclude that he has overcome, by a preponderance of the evidence, the presumption that the defendants' actions fall within the scope of section 11112(a)? *See id.; Bryan v. James E. Holmes Regional Medical Ctr.*, 33 F.3d at 1333 ("In a sense, the presumption language in HCQIA means that the *plaintiff* bears the burden of proving that the peer review process was *not* reasonable.").

### a. § 11112(a)(1)

██ We find that plaintiff has not provided or pointed to any evidence from which a jury could reasonably conclude that he has overcome the presumption that the Board's proposed restrictions on Dr. Mathews' privileges were taken "in the reasonable belief that the action was in furtherance of quality health care." The undisputed evidence shows that, in making its decision, the Board relied on the findings of the Rothacker Committee and the independent expert Dr. Wilson, as reported to the Board by LGH CEO Mr. Young and defendant Dr. Hoke. The Rothacker Committee report represents the conclusion of a committee of three board certified orthopedic surgeons that 23 of Dr. Mathews cases during a six-month period did not meet the appropriate standard of care. These findings were confirmed by those of the independent expert, Dr. Wilson of Cornell Medical College. Dr. Wilson was selected by the American Medico-Legal Foundation, an independent organization. He is a board certified orthopedic surgeon who has practiced and taught in the field of orthopedic surgery for over 40 years.

After reviewing the cases identified by the Rothacker Committee, Dr. Wilson submitted a detailed report in which he concluded that the pattern and trend of care reflected were "substandard" in fourteen separate respects, which he enumerated. The reasons listed are all grounded in legitimate health care quality concerns including, for example, "incredibly poor documentation of patient workups," "failure to use alternative imaging techniques" and "lack of judgement [sic] in applying extensive lumbar surgical decompressions and fusions to patients irrespective of age and type of condition." *See Imperial v. Suburban Hosp. Ass'n*, 37 F.3d at 1029 (defendants acted in furtherance of quality health care where "throughout the proceedings every doctor's opinion about [plaintiff] related to the issue of health care quality"). Dr. Wilson recommended, *inter alia*, that the privileges of Drs. Mathews and Kent to perform spine surgery be restricted until they were able to "demonstrate a renewed and updated understanding of present day principles and practice of this type of surgery." The restrictions voted on by the Board appear tailored to meet the concerns raised by Dr. Wilson's report. Thus, in addition to the statutory presumption in favor of defendants, the evidentiary record in this case provides ample support for the conclusion that the Board's action was taken in a reasonable belief that it would further quality health care.

Dr. Mathews argues at length that participants in the peer review process were motivated by a desire to eliminate him as a competitor, rather than by legitimate health care concerns. For a number of reasons, we find this argument insufficient to overcome the presumption of compliance with the Act. First, we agree with those courts which have found that since the test of section 11112(a) is an objective one, assertions of bad faith or anticompetitive motive are irrelevant to the question of whether a decision was taken in a reasonable belief that it would further quality health care. Instead, the court must consider the adequacy of the basis for the decision made. *See Bryan v. James E. Holmes Regional Medical Ctr.*, 33 F.3d at 1335; *Austin v. McNamara*, 979 F.2d at 734 ("[A]ssertions of hostility . . . are irrelevant to the reasonableness standards of § 11112(a). The test is an objective one, so bad faith is immaterial. The real issue is the sufficiency of the basis for the defendants' actions."); *Crosby v. Hos-*

*pital Authority*, 873 F.Supp. 1568 (M.D.Ga. 1995) (presumption of compliance with Act not rebutted by physician's allegation that direct economic competitors on review board had anticompetitive motive); *Monroe v. AMI Hosp. of Texas*, No. H–93–620, 1994 WL 757527, at *5 (S.D.Tex. Oct. 31, 1994) (physician's allegation that peer review by competitors was motivated by anticompetitive considerations insufficient to overcome presumption of compliance with Act).

Moreover, even if subjective motivations were relevant to the section 11112(a) inquiry, Dr. Mathews has produced no evidence that anticompetitive considerations actually entered into the Board's decisionmaking process.[4] *See Bryan v. James E. Holmes Regional Medical Ctr.*, 33 F.3d at 1335 (fact that plaintiff introduced no evidence that alleged personal animosity of board and executive committee members determined the outcome of the peer review process weighed against finding that presumption had been overcome); *Imperial v. Suburban Hosp.*, 37 F.3d at 1029 (although plaintiff claimed peer review participants were biased against him, court found that defendants were entitled to HCQIA immunity, stating that "[n]owhere in the record can we find any suggestion that any issue, other than a legitimate health care concern, was presented or considered"). There is no evidence that the reports contained or that the Board considered any supporting evidence that was not related to the quality of health care. Rather, Dr. Mathews appears to base his argument solely on his allegation that the defendants were his competitors and stood to gain by eliminating him from the market.

■ Mere participation by plaintiff's competitors in the Hoke or Rothacker Committee investigations or the Board's vote, however, does not run afoul of the HCQIA. Although the Act suggests that a hearing officer or individuals sitting on a hearing panel should not be in direct competition with the physician who is the subject of the hearing, *see* § 11112(b)(3)(A)(ii) & (iii), it imposes no such requirement on participants in other phases of the peer review process. To

the extent plaintiff is attempting to suggest that it was not reasonable for the Board to rely on the Rothacker report because it was generated by orthopedic surgeons who are plaintiff's competitors, this contention is negated by the fact that the committee's findings were confirmed by Dr. Wilson, who is not in any way in competition with Dr. Mathews. Moreover, we note that although the HCQIA does not require it, the physician members of the Board, defendant Drs. Hoke, Argires, and Shertzer, abstained from voting on the privilege restriction. Thus, plaintiff's arguments concerning his competitors' participation in the peer review process cannot serve to rebut the presumption in favor of defendants.

Further, we find that the cases cited by plaintiff in support of his position are inapposite. For example, plaintiff cites *Manion v. Evans*, No. 3:89CV7436, 1991 WL 575715 (N.D.Ohio July 8, 1991), for the proposition that his evidence of a possible economic motivation on the part of Dr. Rothacker precludes a grant of summary judgment to defendants. The portion of *Manion* cited by plaintiff, however, deals with a provision of the Act which provides that HCQIA immunity does not extend to persons who knowingly provide false information to a professional review body. *See id.* at *13; 42 U.S.C. § 11111(a)(2). There has been no allegation, nor is there any evidence, that Dr. Rothacker knowingly provided false information during the peer review process, and this section of the Act is not at issue in this case. *Swarthmore Radiation Oncology, Inc. v. Lapes*, 1993 WL 517722 (E.D.Pa.1993), and *Pagano v. Oroville Hosp.*, 145 F.R.D. 683, 694 (E.D.Cal.1993) are similarly irrelevant to the present inquiry. They address the question of whether the HCQIA creates a federal statutory peer review privilege allowing defendants to avoid producing certain materials requested in discovery. *Williamson v. Sacred Heart Hosp.*, No. 89–30084–RV, 1993 WL 543002 (N.D.Fla. May 28, 1993), *aff'd*, 41 F.3d 667 (11th Cir.1994), also provides little guidance in that it contains no discussion of

---

4. In fact, he concedes that the Board relied exclusively on the reports of the Rothacker Committee and Dr. Wilson as conveyed to the Board by Dr. Hoke and Mr. Young.

the court's basis for denying summary judgment on the issue of HCQIA.

Finally, plaintiff relies heavily on *Islami v. Covenant Medical Center, Inc.*, 822 F.Supp. 1361 (N.D.Iowa 1992). Although plaintiff correctly points out that *Islami* involves factual circumstances which are in some ways similar to those in the case at bar, the court held only that the defendants were not entitled to summary judgment because a factual issue existed as to whether they had afforded the plaintiff adequate notice and hearing procedures. The court did not address the bearing of the facts of the case on the issue of whether defendants had acted in the reasonable belief that their actions were in furtherance of quality health care. Moreover, we note that, in support of his HCQIA argument, plaintiff has twice quoted a lengthy passage from *Islami* which has nothing to do with the HCQIA, but rather deals with the question of whether, for purposes of Sherman Act liability, the defendants were incapable of conspiracy as a matter of law.

 Plaintiff has also submitted the expert report of Dr. J. Leonard Goldner, which questions the validity of the methodology used and the conclusions reached by Dr. Wilson. This too, is insufficient to overcome the presumption that defendants' actions were taken in the reasonable belief that they were in furtherance of quality health care. The report does indicate that a difference of opinion exists as to the propriety of Dr. Mathews medical practices. However,

> [The] HCQIA clearly grants broad discretion with regard to staff privileges decisions.... [T]he role of federal courts 'on review of such actions is not to substitute our judgment for that of the hospital's governing board or to reweigh the evidence regarding the renewal or termination of medical staff privileges.'

*Bryan v. James E. Holmes Regional Medical Ctr.*, 33 F.3d at 1337 (quoting *Shahawy v. Harrison*, 875 F.2d 1529, 1533 (11th Cir. 1989)).

Viewed in the light most favorable to plaintiff, Dr. Goldner's report may provide a rea-

sonable basis for a jury to conclude that Dr. Mathews rendered acceptable care. This, however, is a different question than whether defendants *formed a reasonable belief* that their actions were in furtherance of quality health care. The fact that a jury could possibly form a different conclusion as to whether the privilege restrictions were warranted is insufficient basis for a finding that the Board's opposite conclusion was unreasonable. Even viewed in the light most favorable to plaintiff, nothing in Dr. Goldner's report tends to suggest that Dr. Wilson's report, upon which the Board relied, was so obviously inadequate or inaccurate that it would have been unreasonable to rely on it as the basis for a belief that restrictions on Dr. Mathews' privileges would further quality health care.[5] *See Imperial v. Suburban Hosp. Ass'n*, 37 F.3d at 1030 ("[E]ven if [plaintiff] could show that these doctors reached an incorrect conclusion on a particular medical issue because of a lack of understanding, that does not meet the burden of contradicting the existence of a reasonable belief that they were furthering health care quality...."); *Austin v. McNamara*, 979 F.2d at 735 (noting that ultimate reasonableness of doctor's suspension was a "different question" than the issue of whether the defendants "acted in the 'reasonable belief that the [suspension] was warranted by the facts known....'). *Cf. Willman v. Heartland Hosp. East*, 34 F.3d 605, 611 (8th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1361, 131 L.Ed.2d 218 (1995) ("Although the record contains evidence from physicians to the effect that in their opinion [plaintiff] had provided acceptable care, we nevertheless conclude that it would not have been unreasonable for [plaintiff's] peer reviewers to have doubts about the quality of [plaintiff's] patient care."). Thus, Dr. Goldner's report cannot serve as a basis for overcoming the presumption that defendants acted in the reasonable belief that their recommendation was in furtherance of quality health care.

### b. § 11112(a)(2)

 We also find that plaintiff cannot overcome the presumption that the Board's

---

5. Moreover, the fact that defendants have submitted three more expert reports concurring with

Dr. Wilson would cast serious doubt on any such assertion.

recommendation was made "after a reasonable effort to obtain the facts of the matter." 42 U.S.C. § 11112(a)(2). The undisputed facts of this case show that Dr. Mathews' standard of care was originally drawn into question when the Rothacker Committee's review of Dr. Kent's work necessarily encompassed many of his cases and raised concerns as to the quality of care provided by both physicians. The reviewing committee was composed of three board certified orthopedic surgeons, the same specialty as practiced by Dr. Mathews. The initial review took more than two years to complete and encompassed 208 cases, representing six months worth of patient care. The Committee concluded that 27 of the 208 cases did not meet the standard of care.

LGH did not rely solely on this report, however, as the basis for its privilege restriction recommendation. Rather, the hospital retained an outside organization, the American Medico–Legal Foundation, to select an independent professional to review the Rothacker Committee's findings. This additional step was not required under the LGH Bylaws. Dr. Mathews was informed of the Rothacker Committee's conclusions and of the fact that an outside reviewer would be retained. He was given the opportunity to, and did, submit additional materials to the outside reviewer, Dr. Wilson. Dr. Wilson essentially confirmed the earlier findings of the Rothacker Committee. Thus, we find that in addition to the statutory presumption in favor of defendants, there is significant evidence indicating that defendants took action only after a reasonable effort to obtain the facts.

In opposition, plaintiff asserts that the LGH Board made its recommendation "without doing any independent investigation of its own." Plaintiff claims that the Board should have considered other available materials, such as reports of the LGH quality assurance program and the LGH Utilization Management Committee. We do not think this argument can overcome the presumption that the Board made a reasonable effort to obtain the facts. The Board based its recommendation on facts surrounding 27 cases in a six-month period that were found not to meet the standard of care. They did not act on the basis of one opinion regarding this group of cases, but waited until a second, independent, confirming opinion could be obtained. The materials which plaintiff would have had the Board consider are not specifically directed to the 27 cases upon which the Board's recommendation was based, nor are they directed exclusively to the six-month period at issue. Rather, they are based largely on aspects of Dr. Mathews' practice other than those upon which the Board based its recommendation. We find nothing in the Act which suggests that a reasonable effort to obtain the facts must include an evaluation of facets of a physician's practice other than those upon which a professional review action is based. That Dr. Mathews may have been up to par in other aspects of his practice does not change the fact that 27 of his cases fell below the standard of care. *See Imperial v. Suburban Hosp. Ass'n,* 37 F.3d at 1029–30 (failure to take into account recent Quality Assurance Committee review which concluded that plaintiff's care was "for the most part" adequate and acceptable did not preclude finding of HCQIA immunity); *cf. Smith v. Ricks,* 31 F.3d at 1486 (fact that plaintiff was not permitted to introduce evidence that other physicians were more incompetent than he was did not indicate that hospital had failed to undertake reasonable effort to obtain facts). The Act imposes no duty to investigate a physician's entire range of conduct before taking a professional review action. Accordingly, the evidence cited by plaintiff cannot be sufficient to overcome the presumption in favor of defendants.

c. § 11112(a)(3)

Section 11112(a)(3) requires that a professional review action be taken only after "adequate notice and hearing procedures are afforded to the physician involved." Section 11112(b) of the Act sets out specific "safe harbor" procedures which, if followed, will satisfy the notice and hearing requirements of subsection 11112(a)(3). Section 11112(b) also provides, however, that "[a] professional review body's failure to meet the conditions described in this subsection shall not, in itself, constitute failure to meet the standards of subsection (a)(3) of this section." Rather, "[t]he ultimate inquiry is whether the notice

and hearing procedures were adequate." *Smith v. Ricks,* 31 F.3d at 1486 (citing *Fobbs v. Holy Cross Health Sys. Corp.,* 789 F.Supp. at 1068).

Here, the undisputed facts show that Dr. Mathews was informed of the conclusions of the Rothacker Committee at the same time those conclusions were reported to the LGH Medical and Dental Staff. He was sent a copy of Dr. Rothacker's March 19, 1992 letter to then-President of the LGH Medical and Dental Staff, Robert P. Johnson, M.D., which contained the committee's conclusions. The letter also contained the Committee's recommendation that the matter be referred to an outside reviewer.

On April 30, 1992, Dr. Mathews was informed by way of a letter from Dr. Johnson that the matter would indeed be referred to an outside consultant. The Executive Committee minutes enclosed with this letter indicated that the outside review "may result in a recommendation regarding Dr. Mathews' clinical privileges." Dr. Mathews was sent copies of the LGH charts for every case in question. He was given the opportunity to, and did, submit additional materials for Dr. Wilson's consideration. By way of a May 10, 1993 letter, Dr. Mathews was informed of Dr. Wilson's conclusions and provided with a copy of his March 18, 1993 report. He was informed that LGH was considering privilege restrictions and that unless he accepted those restrictions voluntarily, the matter would be referred to the LGH Medical and Dental Staff Executive Committee for its recommendation and then to the LGH Board for its decision. Dr. Mathews was invited to discuss the recommended restrictions informally before responding, which he did. We note that during these preliminary investigative stages, no "professional review action" triggering the protections of section 11112(a) had yet taken place. Thus, the notices and opportunities for input afforded plaintiff up un-

til this point were actually above and beyond those required by the Act.

Although Dr. Mathews was not present at the September 16, 1993 meeting at which the Board voted to restrict his privileges, he was informed of the Board's proposed action and the reasons supporting it by way of a September 22, 1993 letter from Mr. Young. The letter also informed him of his right to request a hearing to review the Board's decision, the time limit for doing so, and a summary of the rights he would be afforded. The letter stated specifically that at the hearing, Dr. Mathews would be entitled to all of the procedural safeguards set out in the HCQIA. Thus, the September 16, 1993 letter conformed exactly with the requirements of section 11112(b)(1) for a "Notice of Proposed Action." [6]

After Dr. Mathews requested a hearing, the Board voted to suspend the proposed restrictions pending the outcome of the hearing. The hearing was never held, however, as it had not yet been scheduled at the time this lawsuit was filed. Although the fact that a hearing has not been held means that defendants cannot satisfy all of the requirements set out in section 11112(b), no facts have been presented which would in any way suggest that LGH did not intend to afford plaintiff all procedures to which he was entitled by both that section and the LGH By-laws. We do not think that a plaintiff may strip a defendant of the protections of the Act merely by failing to complete the entire scope of review procedures available to him. Up to the point at which the process was terminated, defendants complied in every way with the "safe harbor" provisions of the Act. Under these circumstances, we find that Dr. Mathews was afforded adequate notice and opportunity to be heard. *See Smith v. Ricks,* 31 F.3d at 1486.

In support of his claim that the procedural requirements of the Act have not been ful-

---

**6.** The section states, in relevant part, that the following requirements must be met:
(1) Notice of proposed action—
The physician has been given notice stating—
(A)(i) that a professional review action has been proposed to be taken against the physician,
(ii) reasons for the proposed action,

(B)(i) that the physician has the right to request a hearing on the proposed action,
(ii) any time limit (of not less than 30 days) within which to request such a hearing, and
(C) a summary of the rights in the hearing under paragraph (3).
42 U.S.C. § 11112(b)(1).

filled, plaintiff argues that the Rothacker Committee investigation of him, as opposed to Dr. Kent, was not properly authorized and that he was not provided with appropriate notice and an opportunity to be heard prior to the issuance of the Committee's report. We have already decided, however, that the Rothacker Committee investigation, as a preliminary, investigative "professional review activity," need not separately meet the notice and hearing requirements of section 11112(a). Thus, these allegations cannot serve as a basis for rebutting the presumption of compliance with the Act.

#### d. § 11112(a)(4)

 Lastly, we hold that the proposed restrictions were warranted by the facts uncovered during the investigation. The restrictions related only to areas in which Dr. Mathews' standard of care had been found to be deficient. They appear designed to address the specific concerns raised by the cases reviewed. Our above discussion of section 11112(a)(1) also provides abundant support for the conclusion that the defendants actions were warranted by the facts uncovered after reasonable efforts at investigation.

In sum, we find that plaintiff has produced no evidence from which a reasonable jury could conclude that he has overcome, by a preponderance of the evidence, the presumption that defendants complied with the requirements of section 11112(a). Accordingly, we hold that defendants are entitled to HCQIA immunity.

#### 5. *Scope of immunity*

 The HCQIA provides that persons entitled to its protection "shall not be liable in damages under any law of the United States or of any State (or political subdivision thereof) with respect to the [professional review] action." 42 U.S.C. § 11111(a). We therefore hold that all defendants, other than Columbia and Columbia Foundation (who have not asserted HCQIA immunity), are immune from damage liability on all counts of both Complaints. However, since the Act

does not provide immunity from suit or from injunctive or declaratory relief, plaintiff's claims remain viable to the extent he seeks non-damage remedies. *See, e.g., Imperial v. Suburban Hosp. Ass'n,* 37 F.3d at 1031; *Manion v. Evans,* 986 F.2d at 1042. An examination of the pleadings indicates that all counts of both Complaints include requests for injunctive relief. Accordingly, we will now proceed to consider defendants' arguments that they are entitled to summary judgment on the substantive merits of plaintiff's case.

### B. Plaintiff's Antitrust Claims

In Count I of both complaints in these consolidated cases, Dr. Mathews alleges an antitrust conspiracy in violation of section 1 of the Sherman Act, which provides that "[e]very contract, combination ... or conspiracy, in restraint of trade or commerce ... is declared to be illegal." 15 U.S.C. § 1. More specifically, Dr. Mathews claims that the defendants conspired to conduct a "sham" peer review investigation of him at LGH, and to curtail his privileges to practice at LGH and Columbia.[7] Plaintiff seeks injunctive relief pursuant to section 16 of the Clayton Act, which provides that "[a]ny person ... shall be entitled to sue for and have injunctive relief ... against threatened loss or damage by a violation of the antitrust laws." 15 U.S.C. § 26. He also seeks treble damages under section 4 of the Clayton Act, which provides that "any person who shall be injured ... by reason of anything forbidden in the antitrust laws may sue therefor ... and shall recover threefold the damages by him sustained." 15 U.S.C. § 15. Because we have granted most of the defendants HCQIA immunity, plaintiff's claim for monetary damages survives only as to Columbia and Columbia Foundation. His claims for injunctive relief, however, survive as to all defendants.

#### 1. *Rule of reason analysis*

 The courts have developed three types of analysis to determine whether a

---

**7.** Plaintiff also argues that defendants conspired to restrict his ability to operate a Spine Center in competition with defendants. However, he does not address this claim separately in his briefs, but appears to rely on the same set of facts presented in support of his arguments regarding the peer review investigation and privilege restriction at LGH. Accordingly, we also will not address this claim separately.

business combination unreasonably restrains trade in violation of section one of the Sherman Act: *per se*, rule of reason, and quick look. *See United States v. Brown University*, 5 F.3d 658, 668–69 (3d Cir.1993). If an alleged restraint falls into a category subject to *per se* analysis, it is conclusively presumed to be unreasonable and the plaintiff need not prove its anticompetitive effects. *Id.* at 669. Most other restraints are examined under the rule of reason analysis, which requires the plaintiff to prove that the challenged conduct suppresses or destroys competition rather than merely regulating and perhaps thereby promoting competition. *Id.* A remaining small category of "inherently suspect" restraints may be subject to the quick look analysis, an intermediate standard which is essentially an abbreviated rule of reason approach. *Id.* The quick look analysis presumes competitive harm and places the burden on the defendant to put forth some competitive justification for the restraint. *Id.*

All parties appear to agree, as does the court, that the instant case is most appropriately analyzed under the rule of reason framework. *See Flegel v. Christian Hosp., Northeast–Northwest*, 4 F.3d 682, 686 (8th Cir.1993) ("The courts of appeals have generally examined the denial or revocation of hospital privileges under the rule of reason.") (citing *Oksanen v. Page Memorial Hosp.*, 945 F.2d 696, 708–09 (4th Cir.1991) (en banc) *cert. denied*, 502 U.S. 1074, 112 S.Ct. 973, 117 L.Ed.2d 137 (1992); *Bhan v. NME Hosp., Inc.*, 929 F.2d 1404, 1411–12 (9th Cir.), *cert. denied*, 502 U.S. 994, 112 S.Ct. 617, 116 L.Ed.2d 639 (1991); *Oltz v. St. Peter's Community Hosp.*, 861 F.2d 1440, 1445 n. 1 (9th Cir.1988); *Goss v. Memorial Hosp. Sys.*, 789 F.2d 353, 354–55 (5th Cir.1986)); *see also Weiss v. York Hospital*, 745 F.2d 786, 820 & n. 60 (3d Cir.1984), *cert. denied*, 470 U.S. 1060, 105 S.Ct. 1777, 84 L.Ed.2d 836 (1985).

To defeat a motion for summary judgment under the rule of reason analysis, a plaintiff alleging a violation of section 1 must prove: (1) concerted action by the defendants; (2) that produced anticompetitive effects within the relevant product and geographic markets; (3) that the objects of the conduct pursuant to the concerted action were illegal; and (4) that it was injured as a proximate result of the concerted action. *Petruzzi's IGA v. Darling–Delaware*, 998 F.2d 1224, 1229 (3d Cir.), *cert. denied sub nom Moyer Packing Co. v. Petruzzi's IGA Supermarkets, Inc.*, —— U.S. ——, 114 S.Ct. 554, 126 L.Ed.2d 455 (1993) (citations omitted); *see also Tunis Bros. Co., Inc. v. Ford Motor Co.*, 952 F.2d 715, 722 (3d Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 3034, 120 L.Ed.2d 903 (1992). "Without proof of all of these elements, a plaintiff cannot maintain a section 1 claim." *Petruzzi's IGA*, 998 F.2d at 1229.

### 2. *Concerted action*

"The very essence of a section 1 claim, of course, is the existence of an agreement. Indeed, section 1 liability is predicated upon some form of concerted action." *Alvord–Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 999 (3d Cir.1994) (citations omitted).[8] Thus, in order to prevail on a section 1 claim, a plaintiff must submit evidence "that reasonably tends to prove that the [defendants] had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 768, 104 S.Ct. 1464, 1471, 79 L.Ed.2d 775 (1984).

In order to withstand a motion for summary judgment on the issue of concerted action, a plaintiff need not establish an explicit agreement, nor must he produce direct evidence of conspiracy. *See Alvord–Polk*, 37 F.3d at 1000; *Petruzzi's IGA*, 998 F.2d at 1230. Rather, a plaintiff may rely on circumstantial evidence and the inferences which may reasonably be drawn from that evidence. *See Alvord–Polk*, 37 F.3d at 1000; *Petruzzi's IGA*, 998 F.2d at 1230. Here, plaintiff appears to concede, and the court finds, that he has not presented any direct evidence of

---

**8.** *Cert. denied sub nom. F. Schumacher & Co. v. Alvord–Polk, Inc.*, —— U.S. ——, 115 S.Ct. 1691, 131 L.Ed.2d 556 (1995), *and cert. denied sub nom. National Decorating Prods. Ass'n, Inc. v. Alvord–Polk*, —— U.S. ——, 115 S.Ct. 1691, 131 L.Ed.2d 556 (1995).

conspiracy. Thus, he must rely on circumstantial evidence.

### a. The "sham" investigation and the restriction of plaintiff's privileges at LGH

■ Concerning the peer review investigation and restriction of his privileges at LGH, Dr. Mathews contends that he has put forth circumstantial evidence "demonstrating a plausible economic reason for each defendants' participation in the conspiracy against him." Plaintiff's 11/14/94 Brief at 72–74. He argues that such evidence precludes a grant of summary judgment against him on the issue of concerted action.

Briefly summarized from the voluminous record, the facts relied upon by plaintiff are as follows. As to LGH, plaintiff primarily contends that at the time the Board voted to restrict his privileges in September of 1993, LGH was a direct competitor of Dr. Mathews by virtue of several agreements it had reached with OAL in January of 1993. Under these agreements, LGH and OAL formed the MidAtlantic Orthopedic Institute ("the Institute"). One purpose of the Institute was for OAL to develop written protocols regarding the delivery of orthopedic services, for which they would be paid by LGH. OAL did indeed produce and receive payment of several hundred thousand dollars for such protocols. It was also contemplated that the Institute would provide orthopedic services through LGH, and that OAL physicians exclusively would treat patients admitted to the hospital through the Institute. As part of the agreements, LGH agreed to "dedicate operating room availability ... in a timely and systematic fashion" to OAL, and to market the capabilities of the Institute. In the end, however, no patients were even seen by the Institute and no operating time was ever dedicated to it. LGH terminated its interest in the Institute in July of 1994. The final aspect of the agreement was that OAL and LGH agreed to attempt to establish a jointly-owned "Coordinated Care Organization," ("CCO") the purpose of which was to avoid the application of a Medicare cap on reimbursements that had the potential to severely impact LGH's "bottom line." LGH

CEO Mr. Young once called the CCO a "matter of economic survival for the Hospital."

Plaintiff also points out that LGH was "virtually landlocked" in that all the real estate immediately adjacent to the hospital was occupied. In summer of 1993, after Dr. Wilson had made his report but before the Board had voted on Dr. Mathews privilege restrictions, LGH attempted to negotiate with Dr. Mathews for the purchase of his interest in his office property across the street from the hospital. It was also planned that Dr. Mathews would relocate his office to the new Health Campus. Dr. Mathews perceived that this agreement was integrally tied to the resolution of the peer review proceedings. On July 29, 1993, he wrote the following in a letter to Dr. Hoke:

> I plan to sign simultaneously with Lancaster General the 554 N. Duke Street Sales Agreement and obtain a certified check for the 554 N. Duke Street property and 'signoff' documents concluding the continuing peer review since 1973.

By way of response, on August 27, 1993 Dr. Hoke wrote plaintiff a letter which stated in relevant part:

> Any purchase agreement which you are negotiating with Lancaster General and your acceptance of the privilege restrictions are totally unrelated and separate issues. The sale of this property cannot be used in negotiating your clinical privileges. Therefore, your response is not acceptable.

Ultimately, LGH and Dr. Mathews never reached an agreement regarding the sale of 554 N. Duke Street.

As to OAL and the defendant OAL physicians, Drs. Rothacker, Westphal, and Shertzer, plaintiff first argues that they were deeply concerned about the economic climate in the medical profession in the 1990s. Dr. Mathews further contends that, like LGH, these defendants were motivated by the OAL–LGH joint venture and that, because they also performed some back surgery, they were his competitors. He also argues that OAL and the OAL physicians were motivated by a desire to obtain more operating room block time for themselves, and points out

that he, Dr. Mathews, was a substantial user of operating room block time. In support of this argument, plaintiff relies heavily on a November, 1991 letter written by Dr. Rothacker to the LGH Foundation Board. The letter expresses disagreement with the hospital's decision not to build additional operating rooms at LGH's Duke Street location, but rather to build them at a "Health Campus" outside the city of Lancaster. In the letter, Dr. Rothacker stated that "loyalty [to LGH] will become very strained an in fact, nonexistent when one has to drive past the Lancaster Surgery Center on one's way out to [the contemplated Health Campus]." Plaintiff characterizes this statement as a threat by all the OAL surgeons to take their patients elsewhere unless LGH provided them with additional operating room block time at LGH's Lancaster facility.

As to the other defendant physicians, Drs. Hoke, Lyet, and Argires, plaintiff argues that they too were competitors of Dr. Mathews. He contends that Dr. Lyet was motivated to exclude Dr. Mathews from the market because his practice group had recently hired a physician who, like Dr. Mathews, was a back surgeon. Dr. Hoke, a radiologist, was allegedly concerned about Dr. Mathews acquisition of new imaging equipment at his office which would provide additional competition for the provision of radiological services.

In response to plaintiff's arguments, defendants maintain that they are entitled to summary judgment because Dr. Mathews has not offered sufficient proof that they acted in concert. Relying on many of the same facts presented in support of their argument for HCQIA immunity, they assert that the LGH Board acted unilaterally and for quality health care reasons when it voted to recommend a restriction of Dr. Mathews' privileges. They further argue that plaintiff's circumstantial evidence of economic motivation is insufficient to overcome the competing inference that defendants acted for procompetitive purposes.

We agree with plaintiff that, viewed in its entirety[9] and in the light most favorable to him, the evidence of record supports a finding that each of the alleged conspirators was a competitor of plaintiff and stood to gain economically from his elimination from the market for orthopedic services. This alone, however, cannot support a finding that defendants conspired to restrict plaintiff's privileges at LGH. At most, plaintiff has shown that each defendant would have been pleased to eliminate plaintiff from the market. He has not presented evidence which tends to suggest that the defendants conspired to achieve this effect.

"Unilateral action, no matter what its motivation, cannot violate [section] 1." *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 110 (3d Cir.1980), *cert. denied*, 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981), *cited in Alvord–Polk*, 37 F.3d at 999. The facts of this case indicate that the decision to restrict plaintiff's privileges was made by the LGH Board alone. Under LGH's Bylaws, only the Board has the authority to restrict a physician's privileges. Thus, on its face, the recommended restrictions on plaintiff's privileges were a unilateral action of the Board. The participation of the other defendants in the Board's decision was limited to: 1) the recommendation by the Rothacker Committee members, Drs. Rothacker, Westphal, and Lyet, that plaintiff's privileges be restricted, and 2) the attendance of Drs. Shertzer, Argires, and Hoke, all of whom abstained from voting, at the Board's September 16, 1993 meeting regarding plaintiff's privileges.

Where a hospital board has ultimate decisionmaking authority, "[s]imply making a peer review recommendation does not prove the existence of a conspiracy; there must be something more such as a conscious commitment by the medical staff to coerce the hospital into accepting its recommendation." *Oksanen v. Page Memorial Hosp.*, 945 F.2d 696, 706 (4th Cir.1991), *cert. denied*, 502 U.S. 1074, 112 S.Ct. 973, 117 L.Ed.2d 137 (1992); *see also Willman v. Heartland Hosp. East*,

9. The Third Circuit has cautioned that "a court should not tightly compartmentalize the evidence put forward by the nonmovant, but instead should analyze it as a whole to see if together it supports an inference of concerted action." *Petruzzi's IGA*, 998 F.2d at 1230 (citing *Big Apple BMW*, 974 F.2d at 1364).

34 F.3d at 612 (where hospital board had final decisionmaking authority, fact that competitors who were involved in the process did not attempt to "pressure, coerce, or lobby the Board members to terminate [plaintiff's] privileges" undermined plaintiffs theory of antitrust liability); *Todorov v. DCH Healthcare Authority,* 921 F.2d 1438, 1459 (11th Cir.1991) ("[T]hat the hospital board had before it recommendations from the medical staff and that the radiologists were pleased with [the hospital's] ultimate decision is, standing alone, insufficient to infer an inference of conspiracy."). We find that this reasoning applies equally to simply attending a Board meeting without voting. Standing alone, such behavior does not give rise to an inference of antitrust conspiracy. Accordingly, we must look for some evidence of undue coercion or influence.

Turning to the question of whether any of the members of the Rothacker Committee coerced, pressured, or lobbied the Board to vote as it did, we note that the record contains absolutely no evidence that Dr. Lyet possessed or utilized any such powers. As to the committee members who were also principals of OAL, Drs. Rothacker and Westphal, plaintiff argues that his evidence of the contractual relationships between OAL and LGH provides support for the conclusion that they were able to unduly influence the Board. The undisputed facts show, however, that after the Committee's results were reported in Dr. Rothacker's letter of March 19, 1992 and at the Executive Committee of the Medical and Dental Staff on April 6, 1992, neither OAL doctor had any further connection with the peer review process.

Negotiations between OAL and LGH did not even begin until October or November of 1992, over six months later, and OAL did not reach a final agreement with LGH until January 1993. Thus, the contention that OAL or Drs. Westphal and Rothacker were attempting or would be able, through the rec-

ommendation, to unduly coerce the Board to make decisions favorable to the OAL–LGH contractual agreement, simply makes no sense. Nor is it likely that LGH would have perceived the recommendation in that way. The fact that the Rothacker Committee itself suggested an additional review by an independently-selected outside consultant further belies any contention that the OAL doctors were attempting to coerce the Board to accept a recommendation favorable to OAL.[10]

As to the defendants who attended the September 19, 1993 Board meeting, Drs. Shertzer, Argires, and Hoke, again plaintiff has provided absolutely no evidence to indicate that Drs. Argires or Hoke had any ability to unduly influence the Board. Dr. Shertzer is a member of OAL, however, the undisputed evidence indicates that he did not vote, and there is nothing in the record to suggest that he even spoke at the meeting. Dr. Shertzer's mere presence in the room cannot suffice to show a conscious commitment to coerce LGH into accepting "OAL's" recommendation.

Finally, we do not think that evidence of the OAL–LGH joint venture can suffice to establish that those two entities conspired to restrict Dr. Mathews' privileges. Viewed in the light most favorable to plaintiff, LGH's promises to "dedicate operating room availability ... in a timely and systematic fashion" to OAL and to market the joint venture provide some support for an inference that OAL might have been able to coerce LGH into voting to restrict plaintiff's privileges. There is not a shred of evidence, however, to suggest that such coercion actually occurred, or that the restriction of plaintiff's privileges was in fact tied to the performance of the OAL–LGH contract in any way.

In sum, we find that the undisputed evidence indicates that the LGH Board acted unilaterally in voting to restrict plaintiff's privileges. Plaintiff has presented no evi-

---

**10.** Plaintiff also points to considerable evidence of an anticompetitive motive on the part of Dr. Rothacker. For example, he alleges that Dr. Rothacker intentionally hijacked the original peer review of Dr. Kent and redirected it at Dr. Mathews. He also contends that Dr. Rothacker withheld favorable information. Plaintiff's brief repeatedly states, however, that these and other actions of Dr. Rothacker were unilateral and without the knowledge of other defendants. Accordingly, we find that this evidence cannot provide a basis for plaintiff's claim that Dr. Rothacker participated in a conspiracy to deny plaintiff's privileges.

dence from which a reasonable jury could conclude otherwise.

The fact that plaintiff is challenging a physician peer review proceeding further compels our conclusion that he has not presented sufficient evidence of concerted action. The Third Circuit has recognized that the physician peer review process has important competition-enhancing purposes and effects.[11] Where challenged conduct has significant procompetitive purposes, the inferences which may be drawn from ambiguous circumstantial evidence are circumscribed. *See In re Coordinated Pretrial Proceedings,* 906 F.2d 432, 439 (9th Cir.1990), *cert. denied sub nom. Chevron Corp. v. Arizona,* 500 U.S. 959, 111 S.Ct. 2274, 114 L.Ed.2d 725 (1991) ("[A] trial judge should not permit an inference of antitrust conspiracy from circumstantial evidence where to do so would deter significant procompetitive conduct."), *cited in Alvord–Polk,* 37 F.3d at 1001; *see also Petruzzi's IGA,* 998 F.2d at 1232. "This is because mistaken inferences in such a context 'are especially costly[;] they chill the very conduct the antitrust laws are designed to protect.' " *Alvord–Polk,* 37 F.3d at 1001 (citing *Matsushita Indus. Co. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 594, 106 S.Ct. 1348, 1360, 89 L.Ed.2d 538 (1986); *Monsanto Co. v. Spray–Rite Service Corp.,* 465 U.S. 752, 763–64, 104 S.Ct. 1464, 1470–71, 79 L.Ed.2d 775 (1984)).

As the Ninth Circuit explained in *In re Coordinated Pretrial Proceedings,*

[w]here an antitrust plaintiff relies entirely upon circumstantial evidence of conspiracy, a defendant will be entitled to summary judgment if it can show that (1) the defendant's conduct is consistent with other plausible explanations, and (2) permitting an inference of conspiracy would pose a significant deterrent to beneficial procompetitive behavior. Once the defendant has made such a showing, the plaintiff must come forward with other evidence that is sufficiently unambiguous and tends to exclude the possibility that the defendant acted unlawfully.

906 F.2d at 439, *cited with approval in Alvord–Polk,* 37 F.3d at 1001; *see also Friedman v. Delaware County Memorial Hosp.,* 672 F.Supp. 171 (E.D.Pa.1987), *aff'd,* 849 F.2d 603 (3d Cir.1988) (citing *Monsanto,* 465 U.S. at 768, 104 S.Ct. at 1473) (plaintiff challenging physician peer review proceeding must submit evidence which "tends to exclude the possibility" that the alleged conspirators acted independently). Moreover, we note that "[i]n drawing favorable inferences from underlying facts, a court must remember that often a fine line separates unlawful concerted action from legitimate business practices." *Petruzzi's IGA,* 998 F.2d at 1230.[12]

The circumstantial evidence cited by plaintiff supports an inference that defendants may have conspired to exclude plaintiff from the market for anticompetitive reasons. However, as we explained at length in our discussion of HCQIA immunity, defendants have presented extensive evidence which supports the competing inference that their decision was made for health care quality reasons. Several Circuit courts have held that where defendants have cited legitimate medical reasons for their conduct, the limitation of staff privileges, without more, does

---

**11.** *See, e.g., Weiss v. York Hosp.,* 745 F.2d at 821 n. 60 ("By restricting staff privileges to doctors who have achieved a predetermined level of medical competence, a hospital will enhance its reputation and the quality of care that it delivers."); *see also BCB Anesthesia Care, Ltd. v. Passavant Memorial Area Hosp. Ass'n,* 36 F.3d 664, 667 (7th Cir.1994) ("A hospital has an unquestioned right to exercise some control over the identity and number to whom it accords staff privileges") (citing *Jefferson Parish Hosp. v. Hyde,* 466 U.S. 2, 30, 104 S.Ct. 1551, 1568, 80 L.Ed.2d 2 (1984)); *Oksanen v. Page Memorial Hosp.,* 945 F.2d at 709 ("[T]he peer review process, by policing the competence and conduct of doctors, can enhance competition."); HCQIA, 42 U.S.C.

§ 11101 (reporting Congress' finding that effective peer review can "restrict the ability of incompetent physicians to move from State to State without disclosure of the physician's previous damaging or incompetent performance").

**12.** Of course we recognize, as the Third Circuit recently reiterated, that the summary judgment standard is no different in an antitrust case than in any other case and that the Supreme Court's decision in *Matsushita* merely reiterated the requirement that a party's inferences be reasonable in order to reach the jury. *See Advo, Inc. v. Philadelphia Newspapers, Inc.,* 51 F.3d 1191, 1195 (3d Cir.1995).

not give rise to an inference of an antitrust conspiracy. For example, in *Willman v. Heartland Hospital East,* the Eighth Circuit held that

> [c]orrective action against a physician does not violate the antitrust laws if the physician's peer reviewers had legitimate medical reasons to believe that the physician provided substandard care. On the other hand, a factfinder may infer the existence of an illegitimate motive if the peer group's conclusions are so baseless that no reasonable medical practitioner could have reached those conclusions after reviewing the same set of facts.

34 F.3d at 611. Similarly, in *Todorov v. DCH Healthcare Authority,* the Eleventh Circuit affirmed the district court's grant of summary judgment to the defendant hospital and group of radiologists where "the record amply support[ed] the procompetitive reasons [the defendant hospital's] board of directors offered for its action." 921 F.2d at 1458.

"[E]vidence of conduct which is 'as consistent with permissible competition as with illegal conspiracy,' without more, does not support an inference of conspiracy." *Alvord–Polk,* 37 F.3d at 1001 (quoting *Matsushita Electric Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 597 n. 21, 106 S.Ct. 1348, 1361 n. 21, 89 L.Ed.2d 538 (1986)). The evidence of economic motivation produced by plaintiff is not sufficiently unambiguous to tend to exclude the possibility that the defendants acted independently. Even in *Islami v. Covenant Medical Center, Inc.,* 822 F.Supp. 1361 (N.D.Iowa 1992), upon which plaintiff heavily relies, the court held that the mere fact that a participant in the peer review process was a competitor of plaintiff and would stand to benefit from eliminating him from competition at the defendant hospital was *not enough* to overcome the competing inference that the person was acting independently in performing his peer review functions. *See id.* at 1385. Given the significant procompetitive purposes of physician peer review, we too will not infer a

conspiracy from ambiguous circumstantial evidence of defendants' economic motivations.

In sum, we find that plaintiff has not provided evidence which tends to exclude the possibility that LGH acted unilaterally in voting to recommend a restriction of plaintiff's privileges. At most, the evidence is as consistent with an anticompetitive motive as with a legitimate health care motive. Under these circumstances, we hold that plaintiff has failed to meet his burden of establishing concerted action.

 In addition to attempting to establish through the evidence of record that the defendants acted in concert, plaintiff contends that the "Ad Hoc Committee" composed of Drs. Rothacker, Westphal, and Lyet constituted a combination as a matter of law.[13] Even assuming that this is true, we find that it does not preclude our grant of summary judgment in favor of defendants.

On this issue, we again find *Todorov v. DCH Healthcare Authority* instructive. In *Todorov,* the Eleventh Circuit found that even if a group of radiologists had conspired among themselves to have another radiologist's privilege application denied, no Section 1 liability could attach because the defendant radiologists did not have the power to effectuate a restriction on plaintiff's privileges. *See* 921 F.2d at 1459. Although the radiologists had recommended that the plaintiff be denied privileges, the final decision was made by the defendant hospital board alone. *See id.* Thus, the court found that plaintiff would be unable to make the requisite showing that the defendants were causally responsible for his injury. *See id.; contrast Weiss v. York Hosp.,* 745 F.2d 786 (3d Cir.1984) (medical staff, which constituted a combination as a matter of law, was only defendant that participated in conspiracy, however, medical staff had power to make staff privilege decisions on behalf of hospital).

Here, as in *Todorov,* the Rothacker Committee did not have the power to effectuate any restrictions on Dr. Mathews' privileges.

---

**13.** *See, e.g., Weiss v. York Hosp.,* 745 F.2d at 815–816 (explaining that "a single entity made up of independent, competing economic entities satisfies the joint action requirement of Sherman Act, section 1").

Under the Bylaws, only the Board could take that step. The only action taken by the Rothacker Committee as a combination [14] was to recommend an outside review and a restriction of plaintiff's privileges if that review concurred with the Committee's findings. Plaintiff has failed to produce any evidence that this recommendation did or could have caused an injury to competition in the relevant market.[15] Thus, he has not only failed to show causation but has also failed to prove an essential substantive element of a Sherman Act section one claim.

In sum we find that, with respect to the restriction of his privileges at LGH, Dr. Mathews' has not presented sufficient evidence of concerted action to withstand defendants' motion for summary judgment.[16]

### b. The restriction of plaintiff's privileges at Columbia

■ In support of his claim of concerted action in connection with the restriction of his privileges at Columbia, Dr. Mathews sets forth the following facts. Columbia and LGH entered into an affiliation agreement on February 28, 1994. The negotiations for the merger occurred between that date and approximately March 1993, a time period which encompasses the events leading up to the expiration of Dr. Mathews' privileges at Columbia. Dr. Mathews claims that, when viewed against the backdrop of these ongoing negotiations, the facts support an inference of conspiracy. In truth, however, the undisputed evidence provides no rational basis for such an inference.

According to the Columbia defendants, Dr. Mathews' privileges at Columbia expired, pursuant to Columbia's Bylaws, solely because Dr. Mathews did not submit a timely and complete reappointment application. It is undisputed that since Columbia grants privileges for periods not exceeding two years, every doctor at Columbia must periodically apply for reappointment of his or her privileges. Under Columbia's Bylaws, if a doctor does not submit a completed reappointment application at least four months prior to the date his current privileges are set to expire, those privileges will automatically expire at the end of the Medical Staff year. Here, Dr. Mathews was required to submit a completed reappointment application by September 1, 1993 in order to avoid expiration of his privileges on December 31, 1993.

As part of the reappointment application, Columbia's Bylaws require a physician seeking reappointment to submit a "reappointment reference" from every other hospital where he or she exercises privileges. Although Dr. Mathews held privileges at LGH at the time he was seeking reappointment to Columbia's staff, he did not include a reappointment reference from LGH with his reappointment application materials. After noticing this omission, Columbia made several unsuccessful attempts to obtain the reference from Dr. Mathews' office or directly from LGH. Columbia made this effort notwithstanding the fact that its Bylaws clearly charge the physician applying for reappointment with the responsibility of assuring that his application is complete. Finally, on November 10, 1993, having failed to secure the reference, Columbia informed Dr. Mathews that his application was incomplete and that his privileges would therefore expire on December 31, 1993.

Significantly, plaintiff does not contest the fact that a reappointment reference is an essential element of a completed reappointment application under the Bylaws. Nor does plaintiff claim that he in fact submitted such a reference. Rather, plaintiff admits

---

**14.** *See Nanavati v. Burdette Tomlin Hosp.*, 857 F.2d 96, 119 (3d Cir.1988), *cert. denied*, 489 U.S. 1078, 109 S.Ct. 1528, 103 L.Ed.2d 834 (1989) (noting that "a group is a combination as a matter of law only for the actions it takes as a group").

**15.** The causal chain is especially attenuated given the intervening Wilson report, upon which the Board apparently placed great emphasis in its decisionmaking process.

**16.** Defendants have also claimed that LGH and the individual physician defendants are incapable of conspiring as a matter of law, to which plaintiff responds that the doctors have individual economic interests separate from those of the hospital which render them capable of conspiring with one another. Because of our holding, we do not reach this argument.

that the Bylaws required him to submit a reappointment reference prior to September 1, 1993 and that he failed to do so. Nevertheless, plaintiff claims that Columbia's citation of the lack of a reappointment reference is a mere pretext and that Columbia's decision not to renew his privileges was in fact the result of an anticompetitive conspiracy with LGH. This claim simply finds no support in the facts.

To begin with, plaintiff characterizes Columbia's November 10, 1993 notification to Dr. Mathews that his privileges would expire at the end of that year as a sudden reversal of a September 1993 decision to grant those privileges. Plaintiff claims that there is no explanation for this "total flip-flop" or "180 degree turn about" except that the Columbia defendants decided in the interim that they would curtail Dr. Mathews' privileges without justification in order to please their prospective merger partner LGH. The undisputed facts show, however, that plaintiff has mischaracterized the evidence and that in fact, the November privilege decision was unrelated to and was not a reversal of the September privilege decision.

In September of 1993, Columbia removed Dr. Mathews from "provisional" status, changing his privileges from "provisional courtesy staff privileges" to "courtesy staff privileges." Under Columbia's Bylaws, a doctor such as Dr. Mathews who has not previously possessed privileges at Columbia is initially placed on "provisional" status for a period of twelve months. If the doctor performs satisfactorily during the twelve-month period, the "provisional" label is lifted. It was this procedure which led to the change in Dr. Mathews' status that was approved by Columbia in September of 1993, twelve months after Dr. Mathews was granted provisional privileges in September of 1992.

The subsequent November decision to deny Dr. Mathews' reappointment application as incomplete was part of an entirely separate process, i.e., the reappointment process described above pursuant to which *all* doctors, regardless of their seniority, must periodically apply for reappointment to Columbia's Medical Staff. Thus, contrary to Dr. Mathews' characterization, there was no

"sudden reversal" of a previous decision to grant him privileges, and therefore the above-enumerated course of events lends no support to his conspiracy theory.

Plaintiff also makes much of the fact that Columbia was willing to lift his provisional status without requiring a reference from LGH, but subsequently insisted on such a reference in denying his reappointment application. Again, plaintiff confuses the provisional status review process with the reappointment process. The undisputed evidence shows that Columbia's Bylaws do *not* require any reference from other hospitals as part of the twelve month review of a new staff member's provisional status, as opposed to the medical staff reappointment process, for which the Bylaws do require such references. Thus, plaintiff can gain no mileage from this "discrepancy."

Plaintiff also attempts to bolster his conspiracy theory by showing that Columbia acted contrary to its economic interest when it allowed his privileges to expire. Basically, plaintiff argues that because he was such a valuable addition to the staff of Columbia, the hospital would never have let his privileges expire unless they were doing so to please LGH. In support of this contention he points to 1) a letter from Columbia which refers to him as "providing needed services to our community" and 2) an August 1993 Credentials Committee report which stated that Dr. Mathews "primarily provides coverage when [another doctor] is on vacation, educational leave, etc. This provides a valuable service to our community and assures us that orthopedic coverage is available seven days a week, 24 hours a day."

In the context of a hospital privileges application, the argument that a hospital acted against its economic interest in curtailing a doctor's privileges makes little sense, for this could be said of nearly every application proceeding that results in a denial or restriction of privileges. Each such action would result in a reduction of the cases admitted by the physician in question, presumably to the economic detriment of the hospital. In this case, the argument carries even less weight because the undisputed evidence shows that in the one year period between September

1992 to August 1993, Dr. Mathews admitted only two patients to Columbia and assisted in only four surgeries there. Thus, no rational jury could conclude that Columbia acted against its economic interest in any meaningful way by allowing his privileges to expire.

Instead, by refusing to ignore its own By-laws and reappoint a physician who was unable to secure a required reference, Columbia acted in furtherance of its economic interest in avoiding negligence liability. The reference from LGH was particularly important given that Dr. Mathews performed the bulk of his surgery at LGH and performed very little work at Columbia from which an accurate indication of his qualification for reappointment could be gleaned.

Finally, plaintiff points out that the contemplated merger between Columbia and LGH would be financially beneficial to Columbia and that one LGH official felt that, without the LGH merger, Columbia would "slowly decay and ultimately close." Plaintiff claims that during a crucial point in the merger negotiations LGH "made known its wishes" that Dr. Mathews' privileges be denied, and that Columbia capitulated to please its "financial savior." Again, these allegations are simply without any basis in fact.

The record does appear to support plaintiff's claim that the Columbia–LGH merger would be financially beneficial to Columbia. However, other than the coincidence of timing, there is absolutely no evidence to suggest that the merger negotiations were in any way connected with the expiration of Dr. Mathews' privileges. In fact, the uncontradicted testimony of three witnesses who took part in the affiliation negotiations indicates that neither Dr. Mathews nor any other individual physician was ever discussed during those talks and that in fact, many of the people on Columbia's side didn't even know who Dr. Mathews was. Moreover, after Dr. Mathews' privileges expired, Columbia subsequently allowed him to apply again for temporary privileges, which were granted. Columbia began considering his new application on December 15, 1993, prior to the completion of the merger negotiations. Like the testimony of those present for the negotiations, these undisputed facts directly contra-

dict any argument that Columbia sought to curry favor with LGH by curtailing Dr. Mathews' privileges.

Plaintiff, however, points to a conversation in which an employee of LGH's Medical Staff Office stated to an employee of Columbia "that Dr. Mathews' Reappointment Reference was with their attorney" and suggested that Columbia "hold up his reappointment until the attorney got back to us." Subsequently, on November 1, 1993, LGH's Dr. Hoke sent Columbia a letter stating that, "We recently performed a focused review on Dr. Mathews' cases. Certain privilege restrictions resulting from this peer review investigation were recommended and are currently under appeal." From these two communications, plaintiff extrapolates that LGH was sending Columbia a message that it had better deny Dr. Mathews' reappointment application or the merger negotiations would suffer. Again, no basis exists for such an inference.

For example, plaintiff argues that Dr. Hoke's letter "falsely" asserts that a focused review of Dr. Mathews had taken place. The characterization of this assertion as "false" is debatable, given that although the focused review was actually of Dr. Kent's cases, many of the cases reviewed also involved Dr. Mathews in some capacity. However, even accepting plaintiff's portrayal of the statement as "false," this fact is irrelevant given the fact that there is absolutely no evidence to suggest that anyone at Columbia knew or suspected that the information contained in the letter was false. Thus, even if Dr. Hoke was attempting to send a message to Columbia that it should deny plaintiff's privileges on a pretextual basis, no one at Columbia received it. Unilateral action on the part of Dr. Hoke provides no support for plaintiff's conspiracy theory.

Plaintiff also assigns great weight to the fact that the letter was sent to Columbia by Dr. Hoke, who plaintiff characterizes as an influential figure in the merger negotiations. However, plaintiff makes no suggestion that responding to requests for letters of reference was not part of Dr. Hoke's role as President of the Medical and Dental Staff, or that the letter was in any other way unusual.

Thus, there is simply nothing about this letter or the earlier communication from the Medical Staff office to suggest any connection whatsoever to the ongoing negotiations.

In sum, we find absolutely no evidence to support plaintiff's conspiracy theory with respect to the denial of his privileges at Columbia. Accordingly, we will grant defendants' summary judgment as to this portion of plaintiff's Section 1 claim as well.

### 3. Antitrust injury

■ In the alternative, we hold that defendants are entitled to summary judgment because Dr. Mathews has failed to establish that he has suffered an antitrust injury. In order to pursue an antitrust action, a private plaintiff must first establish that he has "antitrust standing." *See Alberta Gas Chemicals v. E.I. Du Pont De Nemours,* 826 F.2d 1235, 1239 (3d Cir.1987), *cert. denied,* 486 U.S. 1059, 108 S.Ct. 2830, 100 L.Ed.2d 930 (1988); *Pennsylvania Dental Ass'n v. Medical Serv. Ass'n,* 815 F.2d 270, 275 (3d Cir.), *cert. denied,* 484 U.S. 851, 108 S.Ct. 153, 98 L.Ed.2d 109 (1987). Antitrust standing goes beyond the Constitutional standing requirement of "injury in fact" and is not satisfied by the mere allegation of a causal connection between an alleged antitrust violation and harm to the plaintiff. *See Alberta Gas,* 826 F.2d at 1239–40. Rather, the plaintiff must prove, *inter alia,* an "antitrust injury," or, in the case of a private plaintiff seeking injunctive relief under § 16 of the Clayton Act, a threat of antitrust injury. *Id.* at 1240.

■ Antitrust injury is defined as "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *See id.* (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977)); *see also Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp.,* 995 F.2d 425, 429 (3d Cir.1993). When determining whether a plaintiff has fulfilled the antitrust injury requirement, a court must analyze the question from the viewpoint of the consumer and must remember that "antitrust law aims to protect competition, not competitors." *Alberta Gas,* 826 F.2d at 1241.

■ Dr. Mathews alleges that a restriction of his privileges will harm competition in the market for orthopedic services in Lancaster County by reducing the supply of such services and eliminating the "low cost alternative" he provides. We find that despite his attempts to couch it in terms of an injury to competition, the harm alleged by Dr. Mathews is essentially harm to himself only. From the standpoint of the consumer, there has been no meaningful change in the market. The undisputed evidence shows that orthopedic services are still readily available from a large and ever-increasing number of providers. The only change is that *Dr. Mathews'* ability to participate in the market has been curtailed, and may be further curtailed if the proposed privilege restrictions actually go into effect. Even this "injury" is of limited significance, given that Dr. Mathews remains able to render most services other than spinal surgery at LGH, and can perform a full range of orthopedic services at facilities other than LGH and Columbia. As for plaintiff's contention that consumers in the relevant market will be denied a low-cost alternative, it too is rendered *de minimis* by the fact that plaintiff retains the privilege to provide most of his low-cost orthopedic services at LGH, which he contends is the dominant hospital in the market, and can perform his low-cost spinal procedures elsewhere within the relevant market. *See United States v. Topco Assocs.,* 405 U.S. 596, 606, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1972) (noting that Congress did not intend for section one to prohibit combinations and contracts that "might in some insignificant degree or some attenuated sense restrain trade or competition").

The Third Circuit has not yet considered the question of standing in the context of an antitrust case challenging only a hospital's staffing decision as to an individual physician. However, another court in our district recently granted summary judgment in favor of defendants under such circumstances, holding that no antitrust injury had been shown. *See Huhta v. Children's Hosp. of Philadelphia,* 1994 WL 245454 (E.D.Pa.1994), *order aff'd,* 52 F.3d 315 (3d Cir.1995). In *Huhta,* the plaintiff was barred from performing or

interpreting certain pediatric cardiology procedures at the defendant hospital. He alleged that this limitation on his privileges would harm consumers, who would be forced to bear the higher costs of defendants' higher prices and duplicative testing. Plaintiff claimed that because he billed directly for his services, he was able to charge amounts substantially less than defendants. Nevertheless, the court found that plaintiff had merely paid "lip service" to the antitrust injuries of others and concluded that "the harm alleged in the complaint is really only harm to the individual doctor, and not harm to competition within the marketplace." *Id.* at \*2. *See also Robles v. Humana Hosp. Cartersville,* 785 F.Supp. 989, 999 (N.D.Ga.1992) (finding no antitrust standing and stating that "[t]he harm alleged in the complaint is really only harm to the individual doctor and not to competition within the marketplace. Thus reduced to its essentials, plaintiff['s] Sherman Act claims rest not on a showing of anticompetitive impact, but merely on the fact that [he] is [a] disappointed competitor who will now be forced to provide [obstetric] services elsewhere'") (quoting *Bellam v. Clayton County Hosp. Auth.,* 758 F.Supp. 1488, 1494 (N.D.Ga.1990)).

We also find *BCB Anesthesia Care, Ltd. v. Passavant Memorial Area Hosp. Ass'n,* 36 F.3d 664 (7th Cir.1994), instructive. In *BCB,* the plaintiff nurse anesthetists alleged that competition was restrained because they could not practice in the business form they preferred and because prices at the defendant hospital were somewhat higher than they had been before the alleged restraint. The Seventh Circuit rejected these claims, holding that "a staffing decision does not itself constitute an antitrust injury." *Id.* at 669. The court commented that,

> [t]he cases involving staffing at a single hospital are legion. Hundreds, perhaps thousands of pages in West publications are devoted to the issues those circumstances present.... Those hundreds or

thousands of pages almost always come to the same conclusion: the staffing decision at a single hospital was not a violation of the Sherman Act.

*Id.* at 667 (citing 28 cases).

Because the injury alleged by Dr. Mathews is really only harm to a competitor, i.e., Dr. Mathews himself, and not to competition, we will add to these thousands of pages our conclusion that plaintiff has not shown an antitrust injury. Accordingly, as an alternative to our holding regarding the sufficiency of plaintiff's evidence of concerted action, we hold that defendants are entitled to summary judgment on plaintiff's Sherman Act claims because plaintiff has failed to establish that he has antitrust standing.

## C. Plaintiff's pendent state law claims

We have granted summary judgment in favor of all defendants except Columbia and Columbia Foundation on plaintiff's pendent state law claims, to the extent they seek monetary damages. We have also granted summary judgment in favor of all defendants on plaintiff's federal antitrust claims. Thus, the only claims that remain before the court are plaintiff's state law claims for monetary damages, to the extent those claims are directed at Columbia and Columbia Foundation, and plaintiff's state law claims for injunctive relief. Defendants argue that they are entitled to summary judgment on these claims as well. However, the Supreme Court has stated that "if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); *see also* 28 U.S.C. § 1367.[17] Accordingly, although we have strong doubts about the validity of plaintiff's remaining claims, rather than addressing defendants' arguments as to their merits, we will dismiss the surviving state law claims for injunctive relief.[18]

---

17. 28 U.S.C. § 1367 codified the common law abstention doctrines and reads in relevant part: (c) The district courts may decline to exercise supplemental jurisdiction over a claim ... if ... (3) the district court has dismissed all claims over which it has original jurisdiction.

18. This dismissal is of course without prejudice to plaintiff's right to present his claims in state court.

## IV. CONCLUSION

We find that defendants, other than Columbia and Columbia Foundation, have established that their actions were taken "in the reasonable belief that they were in furtherance of quality health care." We therefore hold that the Health Care Quality Improvement Act, 42 U.S.C. §§ 11101–11152 (West Supp.1994), affords these defendants immunity from damages as to all Counts of both Complaints. This is exactly the type of situation the Act was designed to protect against. We further hold that all defendants are entitled to summary judgment on plaintiff's Sherman Act claims, because plaintiff has failed to provide sufficient evidence of concerted action, and also because plaintiff has failed to establish that he is entitled to antitrust standing. Having granted summary judgment on the only federal claims, we decline to exercise jurisdiction over plaintiff's pendent state law claims, to the extent those claims survive our ruling as to HCQIA immunity.

### ORDER

AND NOW, this 4th day of May, 1995, having considered the motions for summary judgment of all defendants, originally filed on October 28, 1994 (LGH Defendants), November 4, 1994 (OAL), and November 9, 1994 (Columbia Defendants), and renewed on January 30, 1995 (OAL) and January 31, 1995 (LGH and OAL Defendants), the plaintiff's responses thereto, and all reply briefs and supplemental briefs filed by the parties, it is hereby ORDERED that:

1. For the reasons stated in the foregoing Opinion, defendants' motions for summary judgment are GRANTED in part and DENIED in part as follows:

 a. Judgment is entered in favor of defendants Lancaster General Hospital, Lancaster General Hospital Foundation, Columbia Hospital, Columbia Hospital Foundation, Gerald W. Rothacker, Jr., M.D., Thomas R. Westphal, M.D., John H. Shertzer, M.D., J. Paul Lyet, M.D., James P. Argires, M.D., and Hugh H. Hoke, Jr., M.D., and against plaintiff Robert S. Mathews, M.D. as to Count I of the Verified Amended Complaint in Civil Action No. 93–6774, and judgment is entered in favor of defendant Orthopedic Associates of Lancaster and against plaintiff Robert S. Mathews, M.D. as to Count I of the Complaint in Civil Action No. 94–4647;

 b. Judgment is entered in favor of all defendants except Columbia Hospital and Columbia Hospital Foundation and against plaintiff on Counts II through IV of the Verified Amended Complaint in Civil Action No. 93–6774 and on Count II of the Complaint in Civil Action No. 94–4647, to the extent those Counts seek money damages; and

 c. Counts II through IV of the Verified Amended Complaint in Civil Action No. 93–6774 to the extent they seek relief from defendants Columbia Hospital or Columbia Hospital Foundation, and to the extent they seek remedies other than damages from the remaining defendants, and Count II of the Complaint in Civil Action No. 94–4647, to the extent it seeks remedies other than damages, are hereby DISMISSED WITHOUT PREJUDICE to the plaintiff's right to pursue these claims in state court if he wishes to do so; and

2. These cases are CLOSED.